

FILED
APR 2 8 2016
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

---

ROSEBUD SIOUX TRIBE,
a federally recognized Indian tribe,
and its individual members,

        Plaintiff,

v.

UNITED STATES OF AMERICA,
DEPARTMENT OF HEALTH AND
HUMAN SERVICES, an executive
department of the United States,
SYLVIA MATHEWS BURWELL,
Secretary of Health and Human
Services, INDIAN HEALTH SERVICE,
an executive agency of the United
States, MARY L. SMITH, Acting
Director of Indian Health Service,
KEVIN MEEKS, Acting Director of the
Great Plains Area Indian Health Service,

        Defendants.

Case No.: 16 - 5027

**COMPLAINT**

---

        Plaintiff Rosebud Sioux Tribe, by its undersigned counsel, hereby brings this

Complaint against the above-named Defendants as follows:

### NATURE OF CLAIM

        1.    This is an action for declaratory and injunctive relief. This action arises

under the Treaty of Fort Laramie, the Snyder Act, the Indian Health Care Improvement

Act ("IHCIA"), the Fifth Amendment to the United States Constitution, federal common

law, the Administrative Procedure Act, and the Declaratory Judgment Act to secure

relief for violations of rights guaranteed thereunder.

## PARTIES

2.      Plaintiff Rosebud Sioux Tribe (the "Tribe") is a federally recognized Indian tribe and is eligible to receive federal services by virtue of its status as an Indian tribe. *See* 72 Fed. Reg. 13648 (2007). The Tribe is a band of the Sioux Nation and as such is a signatory tribe to the Treaty of Fort Laramie, and its individual members are beneficiaries of the covenants contained therein. *See* 15 Stat. 625 (1968). The Tribe's governmental headquarters is 11 Legion Avenue, Rosebud, South Dakota 57570. The individual members of the Tribe constitute its governing body.

3.      Defendant United States of America is bound by the obligations herein described and responsible for the actions of the other defendant parties described below.

4.      Defendant Department of Health and Human Services ("HHS") is a federal, cabinet-level agency charged with enhancing and protecting the health and well-being of all Americans. As part of this mission, HHS is charged with enhancing and protecting the health of Indians, in part by and through Defendant Indian Health Service.

5.      Defendant Sylvia Mathews Burwell is sued in her official capacity as the Secretary of HHS.

6.      Defendant Indian Health Service ("IHS") is a federal executive agency operating within the Department of Health and Human Services ("HHS"). IHS is responsible for providing, administering, and overseeing federal health services to Indians throughout the United States.

7.     Defendant Mary L. Smith is sued in her official capacity as Acting Director of IHS.

8.     Defendant Kevin Meeks is sued in his official capacity as Acting Director of the Great Plains Area (including South Dakota) of IHS.

## JURISDICTION AND VENUE

9.     The Court has jurisdiction over this action under 28 U.S.C. § 1331 and 28 U.S.C. § 1362 because this is a civil action brought by an Indian tribe that arises under the Constitution, laws, and treaties of the United States. The Court also has jurisdiction under 28 U.S.C. § 1346 because this is an action for declaratory judgment and injunctive relief against the United States.

10.     The United States has waived its immunity from suit under Section 702 of the Administrative Procedures Act ("APA"), 5 U.S.C. § 702. Section 702 of the APA waives sovereign immunity for all claims for relief other than monetary damages, including all forms of equitable relief, involving a federal official's action or failure to act. This waiver of immunity applies to any such suit, regardless of whether the suit is brought under the APA. It also waives sovereign immunity for those causes of action grounded in the APA.

11.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1) and 28 U.S.C. § 1391(b)(2) because IHS is an agency of the United States, and a substantial part of the events or omissions giving rise to the claims herein have occurred within this judicial district.

## FACTUAL ALLEGATIONS

**The Trust Relationship between the United States and Indian Tribes**

12.     The trust relationship between the federal government and Indian tribes is rooted in promises made to Indian tribes by the federal government in treaties and reinforced by federal statutes and common law.

13.     The United States Constitution empowers the federal government to negotiate and enter treaties with Indian tribes. *See, e.g.,* CONST. art. I, § 8; CONST. art. II, § 2; CONST. art. IV, § 3.

14.     Pursuant to this constitutional authority, the federal government entered into a series of treaties with Indian tribes. These treaties generally contained promises by Indian tribes for land and peace in exchange for services to the tribes from the United States and also created a general trust relationship between the United States and Indian tribes.

15.     The trust relationship that originated in treaties was reinforced early on by federal common law. As early as 1831, and consistently thereafter, the United States Supreme Court has recognized the special duty the federal government assumed in its dealings and agreements with Indians. *See Cherokee Nation v. Georgia*, 30 U.S. 1 (1831); *United States v. Mitchell*, 463 U.S. 206, 225 (1983) (noting that a principle that "has long dominated the government's dealings with Indians . . . [is] the undisputed existence of a general trust relationship between the United States and the Indian people"); *Seminole Nation v. United States*, 316 U.S. 286, 296–97 (1942) (recognizing "the distinctive obligation of trust incumbent upon the [federal] Government in its dealings with

4

[Indians]"); *see also Eric v. Sec'y of U.S. Dep't of Hous. & Urban Dev.*, 464 F. Supp. 44, 46

(D. Alaska 1978) ("The doctrine that the federal government stands in a fiduciary

relationship to Native Americans has been a part of our common law since the early

days of the Republic.").

**The Federal Government's Trust Duty to Provide Health Care to Indians**

16.    In keeping with its general trust responsibility to Indians, for over a

century, the United States government has undertaken the specific trust obligation of

providing health care to Indians. Felix S. Cohen, COHEN'S HANDBOOK OF FEDERAL

INDIAN LAW § 22.04[1] (2005). The United States has repeatedly reinforced its duty to

provide health care for Indians through legislation. For example, the Snyder Act of

1921, 25 U.S.C. § 13, and the IHCIA, 25 U.S.C. § 1601 *et seq.*, expressly provide legislative

authority for Congress to appropriate funds specifically for Indian health care. The

purposes of these laws are to provide "relief of distress and conservation of health to

Indians," 25 U.S.C. § 13, to "eliminat[e] the deficiencies in health status and health

resources of all Indian tribes," 25 U.S.C. § 1621(a)(1), "to ensure the highest possible

health status for Indians . . . and to provide all resources necessary to affect that policy,"

25 U.S.C. § 1602(1), and "to provide the quantity and quality of health services which

will permit the health status of Indians to be raised to the highest possible level,"

25 U.S.C. § 1601(3).

17.    More recently, in passing the Affordable Care Act, Congress reauthorized

and made permanent the federal government's trust responsibility to Indians. In

affirming its duty to Indian tribes, Congress declared that "it is the policy of this nation,

in fulfillment of its special trust responsibilities and legal obligations to Indians –[] to ensure the highest possible health status for Indians and urban Indians and to provide all resources necessary to effect that policy[.]" 25 U.S.C. § 103 (2009). President Obama reaffirmed this duty in signing the 2010 bill amendment to the IHCIA, stating that the federal government's "responsibility to provide health services to American Indians . . . derives from the nation-to-nation relationship between the federal and tribal governments." President Barack Obama, Statement by the President on the Reauthorization of the Indian Health Care Improvement Act (Mar. 23, 2010).

18.     Congress has recognized that South Dakota Indian tribes, which include the Rosebud Sioux Tribe, are entitled to special statutory protections due to their proactive leadership in the federal-tribal relationship. *See, e.g.*, 154 Cong. Rec. S10709 (2008) (statement of Sen. Reid). Congress has specifically recognized the Treaty of Fort Laramie as an example of the proactive leadership of South Dakota tribes. *Id.* The Treaty of Fort Laramie was a treaty entered into by the federal government and tribes of South Dakota to end hostilities and to cede tribal land to the government in exchange for the government providing health care and other necessities to the tribes. *Id.*

19.     In enacting the Snyder Act, the IHCIA, and the Affordable Care Act, Congress imposed statutory trust duties on the United States to confer upon tribes the right to receive health care services and a duty to protect these rights. Through such legislation, "Congress has unambiguously declared that the federal government has a legal responsibility to provide health care to Indians." *White v. Califano*, 437 F. Supp. 543, 555 (D.S.D. 1977). Having undertaken responsibility for Indian health care, the

United States has a statutory and fiduciary trust obligation to provide such care in a competent manner.

20.     Federal courts have consistently reinforced Congress's recognition of the federal government's responsibility for Indian health care and duty to assure reasonable health care services to Indians. *See, e.g., Blue Legs v. U.S. Bureau of Indian Affairs*, 867 F.2d 1094, 1000 (8th Cir. 1988) (noting that "[t]he existence of a trust duty between the United States and an Indian or Indian tribe can be inferred from the provisions of a statute, treaty or other agreement, 'reinforced by the undisputed existence of a general trust relationship between the United States and the Indian people'") (citation omitted); *McNabb v. Bowen*, 829 F.2d 787, 792 (9th Cir. 1987) (noting that in "reviewing the text of the IHCIA and the relevant legislative history, one is struck by Congress' recognition of federal responsibility for Indian health care").

21.     Based on the Constitution, treaties, statutes, and common law, the Tribe trusts and expects that the federal government will keep its promise to provide health care to permit the health status of the Tribe and its individual members to be raised to the highest possible level.

**The Health Care Crisis Facing Indian Tribes**

22.     Despite the federal government's trust duty to provide health care to Indians, the federal government spends less on Indian health care than on any other group receiving public health care.

23.     Indians have a lower life expectancy than the other racial or ethnic groups in the nation.

24. Indians' access to routine health care is far less than the national average.

25. A comparison of Indians with other populations for whom the United States has direct responsibility for health care, such as federal prison inmates, veterans, and Medicare recipients, shows the distinct disparities in expenditures for health care services. U.S. Commission on Civil Rights, *A Quiet Crisis: Federal Funding and Unmet Needs in Indian Country* 43 (July 2003). In 2009, IHS spent approximately $2,130 per capita on Indians, in contrast to prison inmate funding of $3,242, veteran funding of $4,653, and $7,784 in funding for Medicare beneficiaries. Mark N. Trahant, *The last great battle of the Indian wars*, Fort Hall: The Cedars Group (2010); Mark N. Trahant, *The Indian health service paradox*, Kaiser Health News (Sept. 16, 2009). More recently, in 2015, IHS spent $3,136 per capita on Indians, in contrast to $8,760 per capita on veterans' medical spending. Indian Health Service, *Briefing* 6 (Apr. 5, 2016).

26. Although IHS is the single largest source of federal spending on Indians, it constitutes only a fraction of the entire budget of HHS.

27. IHS does not provide sufficient federal funding to cover the health care needs of members of the Tribe.

28. The federal government's failure to sufficiently fund Indian health care to keep pace with the rising costs of health care has caused a significant growth of unmet medical needs.

29. These problems in the allocation and quality of health care are not new and have not been adequately addressed by IHS. This is underscored by the fact that on February 3, 2016, the Senate Committee on Indian Affairs held an oversight hearing on

identical issues that were raised at a December 28, 2010 Senate Committee on Indian Affairs hearing. *Compare* Statement of Robert McSwain, Principal Deputy Director, Indian Health Service, Reexamining the Substandard Quality of Indian Health Care in the Great Plains (Feb. 3, 2016), *with* U.S. Senate Committee on Indian Affairs, In Critical Condition: The Urgent Need to Reform the Indian Health Service's Aberdeen Area (Dec. 28, 2010).

30.     These funding shortages are exacerbated by the unique challenges faced by rural hospitals serving tribes and their members. In rural communities in the Great Plains such as Rosebud, South Dakota, hospitals face a number of challenges in providing adequate health care to patients, including "recruiting and retaining qualified health care staff, providing competitive salaries, and the availability of suitable housing, schools and community resources for staff." Statement of Robert McSwain, Principal Deputy Director, Indian Health Service, Reexamining the Substandard Quality of Indian Health Care in the Great Plains 4 (Feb. 3, 2016). The challenges posed by physician vacancies undermine the delivery of safe and quality health care to tribal members.

**The Rosebud Sioux Hospital**

31.     The Rosebud Indian Health Service Hospital ("Rosebud Hospital") in Rosebud, South Dakota, is the primary source of health care for the Tribe and its members.

32.     In fiscal year 2015, the 35-bed Rosebud Hospital had 12,760 emergency room visits.

33.     The Rosebud Hospital faces a number of administrative difficulties such as understaffing and underfunding that hinder patient care. These administrative difficulties are partly the result of the Rosebud Hospital's challenges in attracting, hiring, and retaining medical staff. These challenges are mostly attributable to inadequate federal funding to offer competitive pay to emergency room providers and supervisors, as well as the lack of housing in the area.

34.     The Rosebud Hospital has struggled to maintain high quality health care professionals and employees in key administrative positions due to these challenges.

**The Shutdown of Emergency Services at the Rosebud Hospital**

35.     On or about November 16-19, 2015, federal surveyors reviewed the Rosebud Hospital to evaluate the hospital's compliance with federal statutory and regulatory requirements.

36.     On November 23, 2015, the Centers for Medicare and Medicaid Services ("CMS") sent the Rosebud Hospital a Notice of Intent to Terminate Medicare Provider Agreement based on alleged deficiencies in the hospital's emergency services. The letter stated that the Rosebud Hospital was not in compliance with the Medicare Conditions of Participation for Hospitals and that the alleged deficiencies were so serious that they constituted an "immediate and serious threat to the health and safety" of "any individual who comes to your hospital to receive emergency services." The letter indicated that termination of the Rosebud Hospital's provider agreement could only be averted by correction of the alleged violations by December 12, 2015.

37.     On December 5, 2015, IHS issued a news release that the Rosebud Hospital was on "divert status" due to staffing changes and limited resources. The IHS news release directed individuals in need of emergency services to the emergency rooms in Winner, South Dakota, and Valentine, Nebraska, which are, respectively, approximately 44 and 55 miles away from the Rosebud Hospital.

38.     According to a March 5, 2016 letter to Senate Committee on Indian Affairs Chairman John A. Barrasso from John Yellow Bird-Steele, Chairman of the Great Plains Tribal Chairman's Association, in the six weeks following the transition of the Rosebud Hospital's emergency room to divert status by IHS, five individuals died and two babies were born in ambulances in transit to the nearest hospitals.

39.     On January 5, 2016, CMS sent the Rosebud Hospital a Notice of Intent to Terminate Medicare Participation based on findings that the Rosebud Hospital was not in compliance with federal statutory and regulatory requirements. Specifically, CMS found that the Rosebud Hospital failed to provide appropriate medical screenings and stabilizing treatment to patients in the emergency room.

40.     On January 7, 2016, United States Senators M. Michael Rounds, John Tune, Al Franken, and Heidi Heitkamp sent a letter to the Chairman and Vice-Chairman of the Senate Committee on Indian Affairs to request that the Senate Committee on Indian Affairs conduct a hearing on the quality of health care provided by IHS hospitals in the Great Plains Area due to concerns about the immediate health care needs of the tribal members arising, in part, from the placement of the Rosebud Hospital's emergency services on diversion status for the foreseeable future.

41.     At the February 3, 2016, hearing of the Senate Committee on Indian Affairs, Chairman Barrasso stated that in response to continuing concerns raised about the state of health care in the Great Plains, which includes the Rosebud Reservation, he dispatched Senate staff to the field to understand what is really happening. Chairman Barrasso, who is also a licensed physician, stated that what the staff found and reported to the committee was "simply horrifying and unacceptable" and can be "summed up in one word-malpractice."

42.     In February 2016, federal surveyors returned to the Rosebud Hospital for further evaluation. The surveyors alleged ongoing noncompliance with seven different Medicare conditions of participation.

43.     On March 1, 2016, CMS sent a Termination Notice to the Rosebud Hospital, informing it that its Medicare provider agreement would be terminated effective March 16, 2016.

44.     IHS' actions in placing the Rosebud Hospital's emergency services on divert status have caused and continue to cause the Tribe and its members immediate and irreparable injury.

## COUNT I
### Violation of 25 U.S.C. § 1631(b)(1):
### Declaratory Judgment and Mandatory Injunction

45.     The Tribe realleges the preceding paragraphs and incorporates them by reference.

46.     The IHCIA, 25 U.S.C. § 1631(b), governs the process by which the government may close IHS healthcare facilities or portions of healthcare facilities.

25 U.S.C. § 1631(b)(1) provides that "no Service hospital . . . or any portion of such a hospital or facility, may be closed if the Secretary has not submitted to the Congress at least 1 year prior to the date such hospital or facility (or portion thereof) is proposed to be closed an evaluation of the impact of such proposed closure[.]" 25 U.S.C. § 1631(b)(1). The evaluation must include an assessment of at least seven factors, including "the quality of health care to be provided to the population by such hospital or facility after such closure," "the views of the Indian tribes served by such hospital or facility concerning such closure," and "the distance between such hospital or facility and the nearest operating Service hospital." *Id.* § 1631(b)(1)(A), (E), and (G).

47.    25 U.S.C. § 1631(b) applies in this case because the closure of the Rosebud Hospital's emergency room is not temporary. 25 U.S.C. § 1631(b)(2). Accordingly, IHS is prohibited under 25 U.S.C. § 1631(b) from closing any healthcare facility without first submitting an evaluation of the impact of such closure to Congress at least one year prior to the proposed date of closure.

48.    IHS failed to comply with the reporting requirements of 25 U.S.C. § 1631(b)(1) by permanently closing the emergency room of the Rosebud Hospital without submitting a written report to Congress one year prior to the date of the proposed closure outlining the impact of the closing on the population served by the hospital.

49.    There is a substantial controversy between the Tribe and IHS of sufficient immediacy and reality to warrant the issuance of a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

50.     For these reasons, the Tribe is entitled to a declaratory judgment that IHS violated 25 U.S.C. § 1631(b) by closing the emergency room of the Rosebud Hospital without submitting a written report to Congress one year prior to the date of the proposed closure outlining the impact of the closing on the population served by the hospital.

51.     The Tribe is also entitled to a mandatory injunction requiring IHS to comply with the statutory notice requirements of 25 U.S.C. § 1631(b) and to re-open and properly staff the emergency room at the Rosebud Hospital until Congress takes final action under 25 U.S.C. § 1631.

## COUNT II
**Violation of the Administrative Procedures Act, 5 U.S.C. § 702 *et seq.*
Declaratory Judgment and Mandatory Injunction**

52.     The Tribe realleges the preceding paragraphs and incorporates them by reference.

53.     The APA provides that "[a] person suffering legal wrong because of agency action, or adversely or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial relief thereof." 5 U.S.C. § 702. The APA allows for judicial review of agency action or inaction that cause harm, and supports the "basic presumption of judicial review." *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967). Unless an action is committed to agency discretion, *see Lincoln v. Vigil*, 508 U.S. 182 (1993), this general presumption of judicial review applies. This Court has previously expressly held that because through the IHCIA, 25 U.S.C. § 1631, "Congress specifically appropriated funds for construction and renovation" of Indian hospitals and "placed

14

statutory conditions upon the expenditure of the construction funds by IHS," that IHS

decisions related to Indian hospitals are judicially reviewable. *Yankton Sioux Tribe v*

*HHS,* 869 F. Supp. 760, 765 (D.S.D. 1994).

54.     The IHCIA governs the process by which the government may close IHS

healthcare facilities or portions of healthcare facilities. 25 U.S.C. § 1631(b)(1) provides

that "no Service hospital . . . or any portion of such a hospital or facility, may be closed

if the Secretary has not submitted to the Congress at least 1 year prior to the date such

hospital or facility (or portion thereof) is proposed to be closed an evaluation of the

impact of such proposed closure[.]" 25 U.S.C. § 1631(b)(1). The evaluation must include

an assessment of at least seven factors, including "the quality of health care to be

provided to the population by such hospital or facility after such closure," "the views of

the Indian tribes served by such hospital or facility concerning such closure," and "the

distance between such hospital or facility and the nearest operating Service hospital."

*Id.* § 1631(b)(1)(A), (E), and (G).

55.     As previously discussed, 25 U.S.C. § 1631(b) applies in this case because

the closure of the Rosebud Hospital's emergency room is not temporary. 25 U.S.C.

§ 631(b)(2). Accordingly, IHS is prohibited under 25 U.S.C. § 1631(b) from closing any

healthcare facility without first submitting an evaluation of the impact of such closure

to Congress at least one year prior to the proposed date of closure.

56.     IHS failed to comply with the reporting requirements of 25 U.S.C.

§ 1631(b)(1) by permanently closing the emergency room of the Rosebud Hospital

without submitting a written report to Congress one year prior to the date of the

proposed closure outlining the impact of the closing on the population served by the hospital.

57.     Because the IHS failed to comply with its obligations under the IHCIA, the Tribe is entitled to declaratory and injunctive relief under the APA, in addition to whatever remedies may be available directly under the IHCIA. *See* 5 U.S.C. § 702 (providing for mandatory and injunction remedies).

58.     For these reasons, under the APA the Tribe is entitled to a declaratory judgment that IHS violated the APA, 5 U.S.C. § 702 *et seq.*, by closing the emergency room of the Rosebud Hospital without submitting a written report to Congress one year prior to the date of the proposed closure outlining the impact of the closing on the population served by the hospital, as required by 25 U.S.C. § 1631(b).

59.     The Tribe is also entitled under the APA to a mandatory injunction requiring IHS to comply with the statutory notice requirements of 25 U.S.C. § 1631(b) and to re-open and properly staff the emergency room at the Rosebud Hospital until Congress takes final action under 25 U.S.C. § 1631.

## COUNT III
### Violation of Treaty, Statutory, and Common Law Trust Duty:
### Declaratory Judgment and Mandatory Injunction

60.     The Tribe realleges the preceding paragraphs and incorporates them by reference.

61.     The federal government has a specific, special trust duty, pursuant to the Snyder Act, the IHCIA, the Treaty of Fort Laramie, and federal common law, to provide

health care services to the Tribe and its members and to ensure that health care services provided to the Tribe and its members do not fall below the highest possible standards of professional care. *See* 25 U.S.C. §§ 1602(1), 1601(3) (describing Congress' goal of ensuring "the *highest possible* health status for Indians" and providing "the quantity and quality of health services which will permit the health status of Indians to be raised to the *highest possible level*") (emphasis added); *McNabb v. Heckler,* 628 F. Supp. 544, 548–49 (D. Mont. 1986), *aff'd* 829 F.2d 787 (9th Cir. 1987) (explaining that the Snyder Act and the IHCIA, "read in conjunction with the trust doctrine, place the burden, in the first instance, upon the IHS programs to assure reasonable health care for eligible members"); *United States ex rel Norton Sound Health Corp. v. Bering Strait Sch. Dist.,* 138 F.3d 1281, 1282 (9th Cir. 1998) (stating that the purpose of the IHCIA "was to ensure sufficient resources to provide Indians with *proper health care*") (emphasis added).

62. Having undertaken responsibility for Indian health care at the Rosebud Hospital, IHS has a statutory and fiduciary trust obligation to provide health care to permit the health status of the Tribe and its individual members to be raised to the highest possible level.

63. The United States breached and continues to breach its trust duty to the Tribe and its members by providing health services to the Tribe at a level that falls substantially below the highest standards of health care and that are inadequate to maintain the health of the Tribe's members.

64.     There is a substantial controversy between the Tribe and IHS of sufficient immediacy and reality to warrant the issuance of a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

65.     For these reasons, the Tribe is entitled to a declaratory judgment that IHS has violated its trust duty owed to the Tribe arising under the Treaty of Fort Laramie, the Snyder Act, the Indian Health Care Improvement Act, and federal common law, to ensure that health services provided to members of the Tribe permit the health status of Indians to be raised to the highest possible level.

66.     The Tribe is also entitled to a mandatory injunction requiring IHS to comply with its trust duties to the Tribe, protect the Tribe's entitlement to health care services, and take sufficient measures to ensure that health services are provided to members of the Tribe to permit the health status of Indians to be raised to the highest possible level.

### COUNT IV
**Violation of Equal Protection and Due Process
Under the United States Constitution:
Declaratory Judgment and Mandatory Injunction**

67.     The Tribe realleges the preceding paragraphs and incorporates them by reference.

68.     The Tribe has *parens patriae* ("parent of the country") standing to bring constitutional claims because the Tribe represents the interests of all of its members and raises claims which affect all of its members. *See, e.g., Miccosukee Tribe of Indians v. United States*, 680 F. Supp. 2d 1308 (S.D. Fla. 2010); *see also W. Va. v. Chas. Pfizer & Co.*, 440 F.2d

18

1079, 1089–90 (2d Cir. 1971) (discussing the *parens patriae* theory of standing without deciding its application to the facts of the case); *Assiniboine & Sioux Tribes v. Montana*, 568 F. Supp. 269, 277 (D. Mont. 1983) (discussing the *parens patriae* doctrine). "When acting solely in a representative capacity, a tribe's standing is based exclusively on the standing of its individual members: the tribe simply raises claims that its members could raise individually, and essentially stands in the same position as they would, had they brought the action collectively." *White Mountain Apache Tribe v. Williams*, 810 F.2d 844, 865 n.16 (9th Cir. 1984).

69.     IHS has violated and continues to violate the right of the members of the Tribe to receive equal protection and due process under law in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution. U.S. CONST. amend. V; *see also Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954) (explaining that principles of equal protection apply to the federal government through the Due Process Clause of the Fifth Amendment rather than the Fourteenth Amendment). IHS has also violated and continues to violate the equal protection and due process rights of the Tribe by taking a valuable right without notice and hearing.

70.     The health care services provided to the Tribe and its members by the United States qualify as an entitlement to a constitutionally protected property interest. *See Rincon Band of Mission Indians v. Califano*, 464 F. Supp. 934, 939 n.6 (N.D. Cal. 1979) (noting that "the benefits at issue here, health care services, are sufficiently similar to welfare benefits . . . to qualify as an 'entitlement' to a constitutionally protected 'property interest'").

71.     The United States allocates and distributes available federal funds in a manner that deprives Indians served by the Rosebud Hospital of health care services that comport with health care that permits the health status of the Tribe and its individual members to be raised to the highest possible level.

72.     There is no rational basis or justification for the United States to provide grossly inadequate health care to members of the Tribe at levels that are substantially below and unequal to health care benefits, on a per capita basis, that the United States provides to federal inmates and others for whom the United States has a constitutional or other legally required obligation to provide health care, and that pose an affirmative risk of harm to tribal members.

73.     Failing to provide adequate care to the Tribe's members without a rational basis violates their right to receive due process and equal protection under law. *See, e.g., id.* at 939 (holding that the United States' deprivation of adequate medical care to California Indians violated their "right to equal protection of the law as guaranteed by the due process clause of the Fifth Amendment" because there was "no rational basis to justify defendants' long history of minimal funding of California Indians health service programs").

74.     Due process requires that the United States provide health care services to members of the Tribe for which they are entitled. Courts have repeatedly recognized substantive due process claims where prisoners or civil committees—for whom the federal government is directly responsible for health care—allege that medical care has fallen below the constitutionally-prescribed level. *See, e.g., Butler v. Fletcher*, 465 F.3d

340, 345 (8th Cir. 2006) (noting that "[p]retrial detainees and convicted inmates, like all persons in custody have the same right to these basic human needs," including medical care, under the Due Process Clause); *Frost v. Agnos*, 152 F.3d 1124, 1131 (9th Cir. 1998) (reversing summary judgment on Section 1983 claim alleging that the county violated pre-trial detainee's substantive due process rights by failing to provide him with accessible shower facilities).

75.     The federal government's administration of IHS and its provision and operation of the Rosebud Hospital in a manner that endangers and poses risk of harm to members of the Tribe violates the Equal Protection Clause and Due Process Clause.

76.     For these reasons, the Tribe is entitled to a declaratory judgment that the federal government's administration of the Rosebud Hospital violates the Equal Protection Clause and Due Process Clause rights of the Tribe members.

77.     The Tribe is also entitled to a mandatory injunction requiring IHS to operate Rosebud Hospital in a manner that complies with the Equal Protection Clause and Due Process Clause rights of the Tribe members.

## PRAYER FOR RELIEF

WHEREFORE, the Tribe prays for the following relief:

1.     A declaratory judgment stating that:

a.     IHS violated 25 U.S.C. § 1631(b) by closing the emergency room of the Rosebud Hospital without submitting a written report to Congress one year prior to the date of the proposed closure

outlining the impact of the closing on the population served by the hospital;

b.     IHS violated the APA, 5 U.S.C. § 702 *et seq.*, by closing the emergency room of the Rosebud Hospital without submitting a written report to Congress one year prior to the date of the proposed closure outlining the impact of the closing on the population served by the hospital, as required by 25 U.S.C. § 1631(b);

c.     IHS has violated its trust duty owed to the Tribe arising under the Treaty of Fort Laramie, the Snyder Act, the Indian Health Care Improvement Act, and federal common law, to ensure that health care provided to the Tribe permits the health status of the Tribe and its individual members to be raised to the highest possible level;

d.     The federal government's administration of the Rosebud Hospital has violated the Equal Protection Clause and Due Process Clause rights of the Tribe members.

2.     An injunction that: (a) preliminarily and permanently forces IHS to re-open and properly staff the emergency room at the Rosebud Hospital and enjoins IHS from further action in closing the Rosebud Hospital's facilities until IHS complies with the statutory notice requirements of 25 U.S.C. § 1631(b)(1); (b) requires IHS to comply with its trust duties to the Tribe, protect the Tribe's entitlement to health care services, take sufficient measures to ensure health services are provided to members of the Tribe

that permit the health status of the Tribe and its individual members to be raised to the highest possible level; and (c) requires IHS to comply with the Equal Protection Clause and Due Process Clause rights of the Tribe members.

3.     An award of costs and disbursements incurred in this lawsuit, without limitation, including attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, and other applicable statutes, and under general principles of law and equity.

4.     An award of such other and further relief, both at law and in equity, as the Court determines to be just and proper.

Dated:  April 27, 2016

ROBINS KAPLAN LLP

By: _____
    Denise S. Rahne (S.D. #4708)
    Timothy Q. Purdon*
    Bruce A. Finzen*
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402-2015
Tel: 612-349-8500
Fax: 612-339-4181
DRahne@RobinsKaplan.com
TPurdon@RobinsKaplan.com
BFinzen@RobinsKaplan.com

*Pro Hac Vice forthcoming.

**ATTORNEYS FOR PLAINTIFF
ROSEBUD SIOUX TRIBE**