

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| ROSEBUD SIOUX TRIBE, a federally recognized Indian tribe, and its individual members,<br><br>    Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA; DEPARTMENT OF HEALTH AND HUMAN SERVICES, an executive department of the United States; THOMAS E. PRICE, Secretary of Health and Human Services; INDIAN HEALTH SERVICE, an executive agency of the United States; CHRIS BUCHANAN, Acting Director of Indian Health Service; FRANCIS FRAZIER, Acting Director of the Great Plains Area Indian Health Service,[1]<br><br>    Defendants. | 3:16-CV-03038-RAL<br><br><br>OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS |

The Rosebud Sioux Tribe (the Tribe) filed a Complaint against the United States of America, the Department of Health and Human Services (HHS) and its Secretary, the Indian Health Service (IHS) and its Acting Director, and the Acting Director of the Great Plains Area of IHS (collectively the Government), seeking declaratory and injunctive relief due to the allegedly inadequate health care provided by IHS to tribal members. Doc. 1. The Government filed a

---

[1] Under Fed. R. Civ. P. 25(d), the following public officials were substituted automatically as proper parties: Thomas E. Price was sworn in as the Secretary of Health and Human Services on February 10, 2017, and is substituted for Sylvia Mathews Burwell; Chris Buchanan is the current acting director of the Indian Health Service and is substituted for Mary L. Smith; and Francis Frazier is the current acting director of the Great Plains Area Indian Health Service and is substituted for Kevin Meeks.

1

motion to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. Doc. 17. The Tribe opposed the motion to dismiss. Doc. 24. The case thereafter was transferred to the undersigned judge. Doc. 33. For the reasons stated below, the Government's motion to dismiss is granted as to Counts I, II, and IV, and denied as to Count III of the Complaint.

## I.      Background

The Government seeks to provide, administer, and oversee health services to members of federally recognized tribes through IHS, which is an agency within HHS. Doc. 1 at ¶ 6. The Rosebud Sioux Tribe is a federally recognized tribe whose members are eligible to receive health care from federally funded IHS facilities. Doc. 1 at ¶¶ 2, 6, 31. The Rosebud IHS Hospital[2] is located in Rosebud, South Dakota, and serves as the primary source of health care for the Tribe's members. Doc. 1 at ¶ 31. Congress makes annual appropriations for all IHS programs, which HHS then distributes among 170 service units, within 12 regional IHS areas. Doc. 18 at 2–3; IHS 2016 Profile, U.S. Dep't of Health and Human Servs. (Sept. 2016), https://www.ihs.gov/newsroom/factsheets/ihsprofile/. Expenses for the treatment of tribal members are reimbursed by Medicare and Medicaid, so long as IHS hospitals comply with the conditions of participation at 42 U.S.C. §§ 1395qq, 1396j.

After federal surveyors inspected and reviewed the Rosebud IHS Hospital in mid-November of 2015, the Centers for Medicare and Medicaid Services (CMS) sent the Rosebud IHS Hospital a "Notice of Intent to Terminate Medicare Provider Agreement" concerning its emergency department. Doc. 1 at ¶¶ 35–36. The CMS stated that the deficiencies discovered during the review process were an "immediate and serious threat to the health and safety [of] any

---

[2] The full name of this IHS facility appears to be Rosebud Public Health Service Hospital, Doc. 19 at ¶ 1, which this Opinion and Order will abbreviate to "Rosebud IHS Hospital."

2

individual who comes to [the Rosebud IHS Hospital] to receive emergency services." Doc. 1 at ¶ 36. To avoid closure of the emergency department, the Rosebud IHS Hospital needed to correct its violations of the Medicare Conditions of Participation for Hospitals by December 12, 2015. Doc. 1 at ¶ 36. On December 5, 2015, IHS announced that the Rosebud IHS Hospital was on "divert status," due to staffing and resource issues, and that individuals seeking emergency services at the Rosebud IHS Hospital would be directed to the emergency rooms in Winner, South Dakota, or Valentine, Nebraska, which are approximately 55 and 44 miles away, respectively. See Doc. 1 at ¶ 37. On January 5, 2016, the Rosebud IHS Hospital was again sent a "Notice of Intent to Terminate Medicare Participation" because of failure to comply with federal requirements. Doc. 1 at ¶ 39. Federal surveyors visited the Rosebud IHS Hospital again in February 2016, and found ongoing noncompliance with Medicare Conditions of Participation. Doc. 1 at ¶ 42. On March 1, 2016, CMS again sent Rosebud IHS Hospital a termination notice, stating that its Medicare Provider Agreement would be terminated March 16, 2016. Doc. 1 at ¶¶ 42–43.

On April 28, 2016, the Tribe filed this suit, an action for declaratory and injunctive relief, with four counts. Doc. 1. Counts I and II of the Tribe's Complaint are based on a provision of the Indian Health Care Improvement Act (IHCIA), 25 U.S.C. § 1631(b)(1), which requires a one-year notice to Congress before any IHS hospital, facility, or portion of such can be closed, in order to evaluate the impact of the closure. Count I alleges a violation of the IHCIA directly, while Count II seeks judicial relief under the Administrative Procedures Act, 5 U.S.C. § 702 (APA), for the alleged violation of the IHCIA. Doc. 1 at ¶¶ 45–59. Count III alleges violation of treaty rights, other statutory obligations, and the trust responsibility obliging the Government to provide health care services to the Tribe's members. Doc. 1 at ¶¶ 60–66. Count IV alleges

3

violations of equal protection and due process under the Fifth Amendment of the United States Constitution stemming from the Rosebud IHS Hospital's emergency department closure. Doc. 1 at ¶¶ 67–77. The Complaint seeks various declaratory and injunctive relief, as well as costs, fees, and other relief deemed proper. Doc. 1 at 21–23.

With its motion to dismiss, the Government filed a Declaration of the Acting Chief Executive Officer at the Rosebud IHS Hospital, and attached various documents to provide information about events that have occurred at the Rosebud IHS Hospital after the suit was filed. Doc. 19. On April 30, 2016, the CMS and IHS entered into a Systems Improvement Agreement to promote future compliance with the Medicare conditions of participation. Doc. 19 at ¶ 13. IHS awarded a contract to AB Staffing Solutions, LLC (ABSS) on May 17, 2016, to provide staffing and management services to the Rosebud IHS Hospital emergency department. Doc. 19 at ¶ 14. The emergency department at the Rosebud IHS Hospital reopened and resumed providing 24-hour emergency care on July 15, 2016. Doc. 19 at ¶ 16. The Government filed its motion to dismiss following these developments. Doc. 17.

The Tribe's response to the motion to dismiss recognizes that the Rosebud IHS Hospital emergency department reopened under ABSS management on July 15, 2016, but raises concerns about ABSS and about ongoing staffing and care issues, submits information about five deaths and delivery of two babies that occurred during transport to off-reservation emergency departments, focuses on its non-IHCIA claims in Counts III and IV, and requests an opportunity for discovery on its IHCIA claims in Counts I and II. Docs. 24, 25, 26, 27, 28. The Tribe likewise filed declarations and additional documents. Docs. 25, 26, 27, 28. The Tribe argues that discovery is required to evaluate the standard of care provided by ABSS, to determine whether the Great Plains Area IHS had discretion with its spending appropriations to specific

4

hospitals, and to test whether the Rosebud IHS Hospital emergency department's divert status truly was temporary. Doc. 24 at 14–16. The Tribe also argues that if this Court relies upon materials outside the pleadings in ruling upon the Government's motion, it must convert this into a motion for summary judgment, upon which "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Doc. 24 at 14 (alteration in original) (quoting Fed. R. Civ. P. 12(d)).

## II.     Legal Standards

### A.     Rule 12(b)(1) and Rule 12(b)(6)

The Government has filed its motion to dismiss under both Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, and Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Doc. 17. To challenge subject matter jurisdiction under Rule 12(b)(1), the Government must either attack the facial or factual basis for jurisdiction. Osborn v. United States, 918 F.2d 724, 729 n.6 (8th Cir. 1990). Regardless of whether the jurisdictional attack is facial or factual, the plaintiff has the burden of proving subject matter jurisdiction. V S Ltd. P'ship v. Dep't of Hous. & Urban Dev., 235 F.3d 1109, 1112 (8th Cir. 2000). Under a facial attack, the "court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." Jones v. United States, 727 F.3d 844, 846 (8th Cir. 2013) (quoting Osborn, 918 F.2d at 729 n.6). However, under a factual attack of the court's jurisdiction, no presumptive truthfulness attaches to the plaintiff's pleadings as under Rule 12(b)(6), because at issue is the court's very power to hear the case. See Osborn, 918 F.2d at 729–30. Under a factual attack to its jurisdiction, the court is free to consider matters outside the pleadings, without invoking Rule 56 and converting the motion to dismiss into a motion for summary judgment, because

"[j]urisdictional issues, whether they involve questions of law or of fact, are for the court to decide." Id. at 729 (citing Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir. 1981)). The Government raises a factual attack to this court's jurisdiction, and this Court can thus consider matters outside the pleadings without converting this motion into one for summary judgment when ruling under Rule 12(b)(1). Doc. 18 at 6 (citing Titus v. Sullivan, 4 F.3d 590, 593 (8th Cir. 1993)); Doc. 35 at 2.

The Government also invoked Rule 12(b)(6) in its motion to dismiss. When considering a motion to dismiss under Rule 12(b)(6), a court must draw all reasonable factual inferences in favor of the non-moving party, but need not accept the nonmoving party's legal conclusions. Freitas v. Wells Fargo Home Mortg., Inc., 703 F.3d 436, 438 (8th Cir. 2013); Retro Television Network, Inc. v. Luken Commc'ns, LLC, 696 F.3d 766, 768–69 (8th Cir. 2012). The court "generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record or do not contradict the complaint, . . . as well as materials that are necessarily embraced by the pleadings." Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999) (internal quotation marks and citations removed). A complaint does not need to contain detailed factual allegations to survive a Rule 12(b)(6) motion to dismiss, only "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," Ascroft v. Iqbal, 556 U.S. 662, 678 (2009), "even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely,'" Twombly, 550 U.S. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). Unlike in a Rule 12(b)(1) motion to dismiss, under Rule 12(b)(6), the moving party has the burden of

proving there is no claim for relief available.  See 5B Charles Alan Wright et al., Federal Practice & Procedure § 1357 (3d ed. 2004); 2-12 James Wm. Moore et al., Moore's Federal Practice § 12.34(1) (3d ed. 2016).

### B. Sovereign Immunity and Standing

The Government raises two general challenges to this Court's jurisdiction—sovereign immunity and lack of standing.  Both of these arguments are Rule 12(b)(1) challenges asserting lack of subject matter jurisdiction.  See Faibisch v. Univ. of Minn., 304 F.3d 797, 801 (8th Cir. 2002); Hagen v. Sisseton-Wahpeton Cmty. Coll., 205 F.3d 1040, 1043 (8th Cir. 2000).

The Government argues that this Court lacks jurisdiction because the Government has not waived its sovereign immunity and the Tribe has not established any independent basis for waiver of sovereign immunity.  Doc. 18 at 7.  The Tribe alleges that this Court has jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1362, and 28 U.S.C. § 1346.  Doc. 1 at ¶ 9.  The Tribe seeks declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, and alleges that the Government has waived its immunity from suit under the APA, 5 U.S.C. § 702.  Doc. 1 at ¶¶ 1, 10.  Although the Declaratory Judgment Act does not provide an independent basis for federal jurisdiction or waiver of sovereign immunity, Zutz v. Nelson, 601 F.3d 842, 850 (8th Cir. 2010), "[t]he APA's waiver of sovereign immunity applies to any suit whether under the APA or not," Chamber of Commerce of U.S. v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996).  See Red Lake Band of Chippewa Indians v. Barlow, 846 F.2d 474, 476 (8th Cir. 1988) ("[T]he waiver of sovereign immunity contained in section 702 is not dependent on application of the procedures and review standards of the APA. It is dependent on the suit against the government being one for non-monetary relief."); Raz v. Lee, 343 F.3d 936, 938 (8th Cir. 2003) (per curiam) ("[S]ection 702 of the [APA] expressly waives sovereign immunity as to any action for non-

monetary relief brought against the United States."); <u>Winnebago Tribe of Neb. v. Babbitt</u>, 915 F. Supp. 157, 165 (D.S.D. 1996) ("The waiver of sovereign immunity in § 702 is not limited to suits brought under the APA . . . Waiver is dependent on the suit against the government being one for non-monetary relief." (internal citations and quotation marks removed)).  The Tribe is seeking non-monetary relief, challenging the actions and inactions of a United States agency. Doc. 1 at 21–23.  Thus, sovereign immunity does not appear to bar the Tribe's claims.

The Government argues that the Tribe lacks standing to bring this suit.  Doc. 18 at 24. Article III of the United States Constitution limits federal court jurisdiction to "cases" and "controversies."  U.S. Const. art. III, § 2, cl. 1.  Standing is one of the essential prerequisites to jurisdiction under Article III.  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992). Standing requires a plaintiff to satisfy three elements: "injury in fact, causation, and redressability." <u>Campbell v. Minneapolis Pub. Hous. Auth.</u>, 168 F.3d 1069, 1073 (8th Cir. 1999) (citing <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 101–04 (1998)). The "injury in fact" must be both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." <u>Lujan</u>, 504 U.S. at 560–61 (internal quotations and citations removed). "[T]here must be a causal connection between the injury and the conduct complained of," and "it must be likely . . . that the injury will be redressed by a favorable decision." <u>Id.</u> (internal quotations and citations removed).  On a motion to dismiss, "general factual allegations of injury resulting from the defendant's conduct may suffice" as proof of the establishment of the elements of standing. <u>Id.</u> at 561.  Standing must be present on each claim brought by the plaintiffs, <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 493 (2009), and must exist throughout the duration of the lawsuit, <u>Missourians for Fiscal Accountability v. Klahr</u>, 830 F.3d 789, 793–94 (8th Cir. 2016) (citing <u>Preiser v. Newkirk</u>, 422 U.S. 395, 401 (1975)). <u>See</u> <u>Steffel v. Thompson</u>, 415 U.S. 452, 459 n.10

8

(1974) ("The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.").

The Government argues that the Tribe lacks standing because it cannot establish "a sufficiently concrete injury traceable to anything the IHS has done." Doc. 18 at 25. The Government further argues that it is not possible for the Tribe to meet the redressability prong of standing because "[m]uch of the relief that Plaintiff seeks, for example, to take sufficient measures, or allocate sufficient funds, to ensure health services to members of the Tribe are raised to the highest possible level . . . is not within the Court's power to grant." Doc. 18 at 26. The Tribe responds by invoking with the doctrine of *parens patriae*,[3] which is specifically pleaded in the Complaint. Doc. 1 at ¶ 68; Doc. 24 at 16. The Tribe, based on a Declaration it filed, contends that five tribal members died in ambulances en route from Rosebud to the nearest emergency department hospital in Valentine, Nebraska, while the Rosebud IHS Hospital emergency department was on its diversion status, and that two female tribal members delivered their babies in ambulances during that same time period. Doc. 1 at ¶ 38; Doc. 24 at 17; Doc. 25 at ¶¶ 3–4.

The *parens patriae* doctrine developed in England, where the King retained the royal prerogative to act "as guardian of persons under legal disabilities to act for themselves." Hawaii v. Standard Oil Co. of Cal., 405 U.S. 251, 257 (1972). In the United States, the doctrine expanded to "establish the right of a State to sue as parens patriae to prevent or repair harm to its 'quasisovereign' interests," id. at 258, defining one such interest as "the health and well-being—

---

[3] The Government does not appear to argue that *parens patriae* standing is inappropriate, but instead argues that the Tribe has failed to establish that there is an injury traceable to IHS actions or omissions. The United States however cites to Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 40 (1976) for the proposition that "[a]n organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Article III." Doc. 18 at 25.

both physical and economic—of its residents in general," <u>Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez</u>, 458 U.S. 592, 607 (1982). The Supreme Court has required for *parens patriae* standing that the alleged injury must affect "a sufficiently substantial segment of its population," and that the injury generally be one a state "would likely attempt to address through its sovereign lawmaking powers." <u>Alfred L. Snapp</u>, 458 U.S. at 607. However, the Supreme Court has also cautioned that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." <u>Id.</u> at 610 n.16; <u>Iowa ex rel. Miller v. Block</u>, 771 F.2d 347, 354–55 (8th Cir. 1985). The Eighth Circuit has considered, but not yet recognized the doctrine of *parens patriae* in the context of tribes suing on behalf of tribal members. <u>See United States v. Santee Sioux Tribe of Neb.</u>, 254 F.3d 728, 734 (8th Cir. 2001); <u>Delorme v. United States</u>, 354 F.3d 810, 816 (8th Cir. 2004). A reported decision within this district has recognized *parens patriae* status for a tribe suing on behalf of its members. <u>See Oglala Sioux Tribe v. Van Hunnik</u>, 993 F. Supp. 2d 1017, 1027–28 (D.S.D. 2014) (granting *parens patriae* status to two tribes seeking review of expedited hearings in Indian Child Welfare Act cases because "this action is inextricably bound up with the Tribes' ability to maintain their integrity," even though not every tribal family is involved in the expedited hearings directly).

The Tribe does not necessarily have to establish *parens patriae* status in order to have standing in this case, because Indian tribes have standing to sue in their governmental capacity to protect their sovereign interests. <u>See Moe v. Confederated Salish & Kootenai Tribes of the Flathead Reservation</u>, 425 U.S. 463, 468 n.7 (1976); <u>see generally Rosebud Sioux Tribe v. South Dakota</u>, 900 F.2d 1164 (8th Cir. 1990) (entertaining complaint by South Dakota Indian tribes against the state of South Dakota regarding the exercise of jurisdiction over highways running through Indian lands within the state); <u>United States v. Jicarilla Apache Nation</u>, 564 U.S. 162

10

(2011) (reviewing suit by tribe against the United States regarding alleged mismanagement of funds held in trust for applicability of attorney-client privilege).   The Tribe "is a federally recognized Indian tribe" that is "eligible to receive federal services by virtue of its status as an Indian tribe." Doc. 1 at ¶ 2.  The Complaint seeks declaratory and injunctive relief in part that "requires IHS to . . . protect the Tribe's entitlement to health care services." Doc. 1 at 22. The health and safety of all its members is part of the Tribe's sovereign governmental interests. See, e.g., Montana v. United States, 450 U.S. 544, 566 (1981).

In either its sovereign capacity or on behalf of its members in a *parens patriae* action, the Tribe must establish an injury-in-fact to satisfy Article III requirements.   Throughout its Complaint the Tribe alleges deficiencies in care at the Rosebud IHS Hospital emergency department.   Doc. 1 at ¶¶ 38, 63, 71. A Declaration augments these claims by providing information on the deaths of five tribal members and the births of two babies that occurred in ambulances transporting tribal members to the nearest open emergency departments while the Rosebud IHS Hospital emergency department was on divert status. Doc. 25 at ¶¶ 3–4. Because this case is only at the initial pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" Lujan, 504 U.S. at 561 (alteration in original) (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 889 (1990)).  The Tribe's Complaint contains the general factual allegations necessary to establish an injury in fact tied to the Government's conduct to support standing at this stage.

The Government also argues that because a court cannot grant the relief requested in the Complaint, the Tribe has failed the redressability prong of standing.  Doc. 18 at 25–26.  "To establish redressability, 'it must be more than merely speculative that the relief requested would

have any effect to redress the harm to the plaintiff.'" Young Am. Corp. v. Affiliated Computer Servs. (ACS), Inc., 424 F.3d 840, 845 (8th Cir. 2005) (quoting Hall v. LHACO, Inc., 140 F.3d 1190, 1196 (8th Cir. 1998)).

The Tribe seeks certain relief that has already occurred, such as reopening and staffing of the emergency department at Rosebud IHS Hospital. See Doc. 1 at 22. Parts of the Complaint and the Tribe's brief focus on funding issues, such as the disparity between what the Government spends meeting federal inmates' health needs versus meeting tribal members' health needs, which are political and legislative policy issues outside the ken of a federal court. See Office of Personnel Mgmt. v. Richmond, 496 U.S. 414, 427–29 (1990). However, the Tribe's prayer for relief also seeks declaratory and injunctive relief of a much more limited nature. Doc. 1 at 21–23. Unlike in Digital Recognition Network, Inc. v. Hutchinson, 803 F.3d 952, 958–59 (8th Cir. 2015), there remains some declaratory and injunctive relief requested that, if awarded, has the ability to offer redress to the Tribe. For instance, in connection with Count III, a declaratory judgment stating that the defendants, which include IHS and others directly responsible for providing health care to the Rosebud Sioux Tribe, have failed to comply with the trust and treaty responsibilities would not be relief granted "through the persuasive or even awe-inspiring effect of the opinion explaining the exercise of its power." Franklin v. Massachusetts, 505 U.S. 788, 825 (1992) (Scalia, J., concurring). Instead, it could be the settling of a dispute that would have an effect on the defendants' behavior towards the Tribe, even if indirectly. See Hutchinson, 803 F.3d at 958 (citing Nova Health Sys. v. Gandy, 416 F.3d 1149, 1159 (10th Cir. 2005)). Ultimately, the Tribe for the reasons explained below presently lacks standing on certain counts, and indeed reopening of the emergency department at Rosebud IHS Hospital results in a loss of standing that the Tribe had to litigate Counts I and II. See Summers, 555 U.S. at 493 (standing

12

must be present on each claim); <u>Klahr</u>, 830 F.3d at 793–94 (standing must existing throughout duration of case).

## III.   Discussion of Individual Counts

### A.   Count I

Count I of the Complaint seeks a declaratory judgment and injunction for an alleged violation of 25 U.S.C. § 1631(b)(1), which is part of the IHCIA. The Government argues that this Court lacks jurisdiction over Count I of the Tribe's Complaint because no violation of 25 U.S.C. § 1631(b)(1) occurred, no possibility for a declaratory judgment or mandatory injunction exists and thus the Tribe has no standing, and there is no waiver of sovereign immunity. Doc. 18 at 7, 9–10, 25. Section 1631(b)(1) states that "no Service hospital or outpatient health care facility of the Service, or any portion of such a hospital or facility, may be closed if the Secretary has not submitted to the Congress at least 1 year prior to the date such hospital or facility (or portion thereof) is proposed to be closed an evaluation of the impact of such proposed closure." Section 1631(b)(2), however, limits § 1631(b)(1) by stating that "[p]aragraph (1) shall not apply to any temporary closure of a facility or of any portion of a facility if such closure is necessary for medical, environmental, or safety reasons."

When the Tribe initially filed its lawsuit in April 2016, the Rosebud IHS Hospital emergency department had been on "divert status" since December 5, 2015, and thereby effectively closed without any evaluation of the closure's impact submitted to Congress. Doc. 1 at ¶¶ 37–44, 48. After the Tribe filed its Complaint, IHS reopened the emergency department at the Rosebud IHS Hospital. Doc. 19 at ¶ 16. The Tribe does not dispute this development, but requests additional discovery "to determine if closure was 'temporary' and whether the Hospital will remain open and functional" as a reason for this Court not to dismiss Count I. Doc. 24 at 16.

However, the fact that the Rosebud IHS Hospital emergency department re-opened and remains open demonstrates that the closure was, *in fact*, temporary. Section 1631(b)(2) plainly states that § 1631(b)(1) "shall not apply to any temporary closure . . . if such closure is necessary for medical, environmental, or safety reasons." The Complaint itself alleges and recognizes that the closure was for such reasons. Doc. 1 at ¶¶ 34, 36, 41–42.

The Tribe submitted information that it mistrusts ABSS to properly run the Rosebud IHS Hospital, Doc. 28, and seeks discovery on whether the Rosebud HIS Hospital emergency department will remain "open and functional," Doc. 24 at 16. The concerns about ABSS are not framed by Count I as it presently exists. Such a concern is better addressed through possible amendment of the Complaint if ABSS is mismanaging the Rosebud IHS Hospital emergency department in a way to give the Tribe a cognizable claim, or a later action if the emergency department re-closes. Concerns about whether ABSS will properly run the emergency department or whether it might be closed at some unknown future date are not the sort of "injury in fact" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical" to establish standing. Lujan, 504 U.S. at 561 (internal quotations and citations removed).

Now that the Rosebud IHS Hospital emergency department has reopened, the Tribe is not entitled to a declaratory judgment that IHS has violated § 1631(b)(1) or a mandatory injunction requiring IHS to comply with § 1631(b)(1) and reopen the emergency department at Rosebud IHS Hospital. Because there remains no colorable claim for a violation of § 1631(b)(1), there is no longer standing for the Tribe to present such a claim. This Court lacks subject-matter jurisdiction as a result and dismissal under Rule 12(b)(1) is required.

14

**B.      Count II**

Count II of the Complaint is closely related to Count I.  In Count II, the Tribe alleges that the violation of § 1631(b)(1) entitles the Tribe to declaratory and injunctive relief under the APA.  Doc. 1 at ¶¶ 52–59.  The Government argues that this Court lacks jurisdiction over Count II because there was no agency violation of § 1631(b)(1) to support the APA claim.  Doc. 18 at 10.  For the reasons explained above, the Government did not violate § 1631(b)(1) through what is now known to be a temporary closure of the Rosebud IHS Hospital emergency department due to medical and safety reasons.  Because the emergency department is currently open and staffed by ABSS, the Tribe's requested relief of an injunction requiring IHS to comply with § 1631(b)(1) and reopen the emergency department cannot be given.  The same reasoning for dismissing Count I applies to and requires dismissal of Count II under Rule 12(b)(1).

**C.      Count III**

Count III of the Tribe's Complaint alleges that "[t]he federal government has a specific, special trust duty, pursuant to the Snyder Act, the IHCIA, the Treaty of Fort Laramie,[4] and federal common law, to provide health care services to the Tribe and its members and to ensure that health care services provided to the Tribe and its members do not fall below the highest possible standards of professional care."  Doc. 1 at ¶ 61.  Alleging that the Government has breached this trust duty, the Tribe seeks declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201.  Doc. 1 at ¶¶ 64–65.  The Tribe also seeks "a mandatory injunction requiring IHS to comply with its trust duties to the Tribe, protect the Tribe's entitlement to healthcare services, and take sufficient measures to ensure that health services are provided to members of

---

[4] Treaty with the Sioux—Brulé, Oglala, Miniconjou, Yanktonai, Hunkpapa, Blackfeet, Cuthead, Two Kettle, Sans Arcs, and Santee—and Arapaho, April 29, 1868, 15 Stat. 635 [hereinafter 1868 Treaty of Fort Laramie].

the Tribe to permit the health status of Indians to be raised to the highest possible level." Doc. 1 at ¶ 66. The Government in its Motion to Dismiss seeks dismissal for lack of jurisdiction, arguing that "none of these authorities, nor the special relationship between the Federal government and Indian tribes, creates an actionable breach of trust claim over which this Court would have jurisdiction." Doc. 18 at 13.

The Supreme Court has affirmed "the undisputed existence of a general trust relationship between the United States and the Indian people." Jicarilla Apache Nation, 564 U.S. at 176 (quoting United States v. Mitchell, 463 U.S. 206, 225 (1983)). Where money damages are sought, a cause of action for breach of that duty does not arise solely out of the general trust relationship. See Mitchell, 463 U.S. at 225; United States v. Navajo Nation, 556 U.S. 287, 302 (2009) (acknowledging that a tribe must point to the violation of a "specific, applicable, trust-creating statute or regulation that the Government violated" before common law principles of the trust relationship applies to establish a violation of a trust responsibility).[5] Where a tribe seeks monetary damages for a breach of the trust relationship, a cause of action will not be found unless the tribe can identify specific treaty provisions, Congressional statues or regulations, or a

---

[5] Some district courts have found § 1331 federal question jurisdiction in breach of trust claims arising out of common law. White v. Matthews, 420 F. Supp. 882, 887–88 (D.S.D. 1976) ("Plaintiff now alleges that one facet of the Indian-government relationship is the duty assumed by the government to care for persons in the class of plaintiff's ward. We consider this simple allegation a sound basis for invoking federal jurisdiction."); Vizenor v. Babbitt, 927 F. Supp. 1193, 1199 n.3 (D. Minn. 1996) ("Plaintiffs' rights are alleged to arise out of the 'trust responsibility' created by federal common law . . . The Supreme Court clearly articulated that an action arising under federal *common law* falls within the general federal question jurisdiction conferred by 28 U.S.C. § 1331." (citing Illinois v. City of Milwaukee, 406 U.S. 91, 100 (1972))); Cobell v. Babbitt, 30 F. Supp. 2d 24, 31 (D.D.C. 1998) ("Although the defendants do not focus their jurisdictional attacks on original jurisdiction, instead relying on the doctrine of sovereign immunity, the Court notes that the plaintiffs' claims arise from rights allegedly granted to them by 29 U.S.C. § 162a and the federal common law of Indian trust management."). For the reasons discussed in this Opinion and Order, this Court need not explore or determine the outer reaches of any common law trust duty owed by the federal government to tribes generally.

16

specific trust corpus that the United States has agreed to safeguard.  See United States v. Navajo Nation, 537 U.S. 488 (2003); F. Cohen, Handbook of Federal Indian Law §§ 5.05[1][b], [2] (Nell Jessup Newton ed., 2012 ed.).  However, even when seeking monetary damages, to maintain a breach of trust claim, a tribe does not need to identify a document that says "in specific terms that a trust or fiduciary relationship exists or is created" where there is federal supervision or control of tribal monies or properties because "[t]he existence vel non of the relationship can be inferred from the nature of the transaction or activity." Navajo Tribe of Indians v. United States, 624 F.2d 981, 987 (Ct. Cl. 1980); see also Mitchell, 463 U.S. at 225; Seminole Nation v. United States, 316 U.S. 286, 296–300 (1943).

When a tribe seeks only equitable relief, as the Tribe does here, courts examine the relevant federal statutes, regulations, and treaties to determine whether a claim for breach of a trust duty exists, and if it does, the scope of that duty.  Blue Legs v. U.S. Bureau of Indian Affairs, 867 F.2d 1094, 1100 (8th Cir. 1989) ("The existence of a trust duty between the United States and an Indian or Indian tribe can be inferred from the provisions of a statute, treaty or other agreement, reinforced by the undisputed existence of a general trust relationship between the United States and the Indian people." (internal quotation removed)); F. Cohen, supra, § 5.05[1][a].  In either case, "[i]n order 'to establish a trust duty,' the burden is on the Tribe to 'identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties.'" Cheyenne River Sioux Tribe v. Jewell, No. 3:15-CV-03018-KES, 2016 WL 4625672, at *7 (D.S.D. Sept. 16, 2016) (quoting Navajo Nation, 537 U.S. at 506).

The Tribe's Complaint and response to the motion to dismiss points to the 1868 Treaty of Fort Laramie, the Snyder Act, the IHCIA, and portions of the Affordable Care Act, along with

17

statements from congressmen, as the sources of the specific trust responsibility for the United States to provide adequate medical care for the Tribe's members. See Doc. 1 at ¶¶ 1, 12–30, 60–66; Doc. 24 at 1, 3–5, 9–11. The 1868 Treaty of Fort Laramie, unlike other treaties used by other tribes in attempts to enforce a health care trust responsibility, includes language relating to health care. In return for vast land cessations, "[t]he United States hereby agrees to furnish annually to the Indians the physician, . . . and that such appropriations shall be made from time to time, on the estimate of the Secretary of the Interior, as will be sufficient to employ such persons." 1868 Treaty of Fort Laramie, supra, art. XIII. The United States also promised to construct at its expense "a residence for the physician." Id. art. IV. However, the United States retained the ability to withdraw the physician after ten years, in return for an additional $10,000 per year paid to the tribes. Id. art. IX. No evidence of record with this Court supports that the United States withdrew the physician, or paid money to do so. The Snyder Act of 1921 directs the expenditure of funds "as Congress may from time to time appropriate," for the "relief of distress and conservation of health" of American Indians. 25 U.S.C. § 13. The IHCIA, first enacted in 1987 and made permanent in 2010 through a provision of the Affordable Care Act, was designed to "ensure the highest possible health status for Indians and urban Indians and to provide all resources necessary to effect that policy." 25 U.S.C. § 1602(1). Congress repeated its findings in the reauthorization, recognizing that "Federal health services to maintain and improve the health of the Indians are consonant with and required by the Federal Government's historical and unique legal relationship with, and resulting responsibility to, the American Indian people." 25 U.S.C. § 1601(1). In 2010, Congress specifically added the word "trust" into the "Declaration of national Indian health policy" found within the IHCIA: "Congress declares that it is the policy of this Nation, in fulfillment of its special trust responsibilities and legal obligations to Indians" to

provide the health care necessary to "ensure the highest possible health status for Indians." Compare 25 U.S.C. § 1602, with Pub. L. No. 102-573, § 3(b), 106 Stat. 4526 (1992).

The above affirmations of a health care trust responsibility are tempered by Supreme Court rulings on the subject of the general trust responsibility, as noted above, and specifically on American Indian health care. The Government argues that because of the lack of a trust corpus, "the sole question is whether the IHS owes any trust duty in relation to its annual appropriations." Doc. 18 at 18. Where money is appropriated to fulfill a treaty obligation, a trust responsibility attaches; where money is a "gratuitous appropriation," no trust responsibility is created. See Quick Bear v. Leupp, 210 U.S. 50, 80 (1908). The Supreme Court dealt specifically with an issue regarding appropriations to IHS in Lincoln v. Vigil, 508 U.S. 182 (1993). In Lincoln, the Court held that lump-sum amounts appropriated to IHS were committed to agency discretion, so long as it allocated funds "to meet permissible statutory objectives." 508 U.S. at 193. At issue in Lincoln was the decision by IHS to discontinue a program assisting handicapped American Indian children in the Southwest and to move that funding to a nationwide program for handicapped American Indian children. Id. at 184. Lincoln focused specifically on whether IHS's decision to terminate the program could be reviewed under the APA, and whether it should have abided by the APA's notice-and-comment rulemaking provisions; it did not opine on a general trust responsibility held by IHS for the care of handicapped American Indian children. Id. at 190, 196.

The Eighth Circuit has recognized, in a limited fashion, the trust responsibility of the United States to provide health care to American Indians. See White v. Califano, 581 F.2d 697 (8th Cir. 1978) (per curiam). In White, the Eighth Circuit in a two-page decision required the federal government, rather than the state of South Dakota, to provide and pay for the involuntary

commitment of an indigent mentally ill woman enrolled in the Oglala Sioux Tribe on the Pine

Ridge Indian Reservation.  Id.  The Eighth Circuit quoted from the district court's opinion and

explained that "[i]n affirming, we adopt the district court's statement of facts and its reasoning as

applied to the conclusions quoted above."  Id. at 698.  Specifically, the Eighth Circuit quoted

from Judge Bogue's opinion:

> We think that Congress has unambiguously declared that the federal
> government has a legal responsibility to provide health care to Indians.  This
> stems from the 'unique relationship' between Indians and the federal government,
> a relationship that is reflected in hundreds of cases and is further made obvious by
> the fact that one bulging volume of the U. S. Code pertains only to Indians.

Id. (quoting White v. Califano, 437 F. Supp. 543, 555 (D.S.D. 1977)). Although the White

decisions pre-date the Mitchell line of trust responsibility cases, nothing in those cases overrules

or otherwise negates White, especially because White involved a request for specific equitable

relief, while the Mitchell line of cases dealt with monetary damages claims made possible under

the Tucker Act, 28 U.S.C. § 1491, and the Indian Tucker Act, 28 U.S.C. § 1505. Relatedly, in

Blue Legs v. United States Environmental Protection Agency, 668 F. Supp. 1329, 1330 (D.S.D.

1987)—a case seeking declaratory and injunctive relief based on the trust responsibility outside

of the health care context—Judge Battey summarized White, explaining that "the law was clear

that the trust responsibility of the federal government in relation to Indian tribes in the area of

health services was explicitly mandated by the Indian Health Care Improvement Act . . . and the

law then in existence." Id. at 1340.  On appeal, the Eighth Circuit affirmed that the specific

agency responsibilities towards the Oglala Lakota Sioux Tribe in cleaning up waste dumps was

"buttressed by the existence of the general trust relationship between these agencies [the BIA and

IHS] and the Tribe." Blue Legs, 867 F.2d at 1100.  The Eighth Circuit explained that "[t]he

existence of a trust duty between the United States and an Indian or Indian tribe can be inferred

20

from the provisions of a statute, treaty or other agreement, 'reinforced by the undisputed existence of a general trust relationship between the United States and the Indian people.'" Id. (quoting Mitchell, 463 U.S. at 225).

The Eighth Circuit[6] has considered a similar case involving the closing of an IHS emergency department. Judge Piersol dismissed the Yankton Sioux Tribe's claim that the government had violated its federal trust responsibility in closing the local IHS emergency department. Yankton Sioux Tribe v. U.S. Dep't of Health & Human Servs., 496 F. Supp. 2d 1044, 1058–59 (D.S.D. 2007). On appeal, the Eighth Circuit affirmed this dismissal, explaining that while there is a general trust relationship present, because the tribe did not identify any trust assets or allege a violation of a statutory or treaty obligation, "[t]he [Yankton Sioux] Tribe's vague allegation that the government violated its federal trust responsibility is not sufficient to state a claim." Yankton Sioux Tribe v. U.S. Dep't of Health & Human Servs., 533 F.3d 634, 644 (8th Cir. 2008). The Yankton Sioux Tribe's complaint,[7] had alleged the trust responsibility in a scant and conclusory manner, alleging only that the action arose from "the special trust relationship between the Federal government and the Indians." YST Complaint at 9. In its prayer for relief, the tribe requested a declaratory judgment that the "proposed closure is contrary to statutory obligations and obligations of the government under the federal trust responsibility

---

[6] Ninth Circuit courts have recently faced this question and have dismissed the tribes' trust responsibility violation claims. The first case appears to have focused on a tribe's arguments that there was a general trust responsibility to provide adequate health care, rather than a specific statutory and treaty responsibility. See Quechan Tribe of the Ft. Yuma Indian Reservation v. United States, No. CIV 10-02261-PHX-FJM, 2011 WL 1211574 (D. Ariz. March 31, 2011), aff'd, 599 F. App'x. 698, 699 (9th Cir. 2015) (relying on language in Lincoln that the Snyder Act and the IHCIA "speak about Indian health only in general terms"). The second case found issue with a tribe failing to identify a trust corpus, distinguishing health care appropriations from a corpus, such as land or natural resources. Gila River Indian Cmty. v. Burwell, No. CV-14-00943-PHX-DGC, 2015 WL 997857 (D. Ariz. March 6, 2015).

[7] The complaint is at 4:06-CV-4180-LLP, Doc. 1, in this Court's CM/ECF system. Citations to this complaint will be "YST Complaint."

of the Federal government to the members of the Yankton Sioux Tribe and other eligible Indians served by the emergency room." YST Complaint at 24–25. By contrast, the Rosebud Sioux Tribe here dedicates roughly five pages of its Complaint to detailed allegations that IHS has a trust responsibility to provide an adequate level of care to its enrolled members, as evidenced by specific statutory language and a specific treaty. See Doc. 1 at 1, 5–7, 16–18. Unlike in Yankton Sioux Tribe, the Tribe here has offered much more than a "vague allegation that the government violated its federal trust responsibility." 533 F.3d at 644.

The Supreme Court's established Indian law canons of construction "require the court to construe the statutes cited in the complaint liberally in favor of the Tribe and to resolve any ambiguous provisions to the Tribe's benefit." Cheyenne River Sioux Tribe, 2016 WL 4625672, at *7 (citing Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 767 (1985)); Oneida Cty. N.Y. v. Oneida Indian Nation of New York State, 470 U.S. 226, 247 (1985) (stating that the "canons of construction applicable in Indian law are rooted in the unique trust relationship," and as such, "that treaties should be construed liberally in favor of the Indians"). Here, the allegations of Count III of the Complaint are sufficient to survive a motion to dismiss. The Tribe has standing to make such claims as the claims are not strictly based on an alleged violation of the IHCIA that has been rectified. The Government has waived sovereign immunity relating to the claim in Count III for the reasons explained above. Count III states a cognizable claim not subject to dismissal under either Rule 12(b)(1) or Rule 12(b)(6).

## D.    Count IV

Count IV of the Tribe's Complaint alleges violation of Due Process and Equal Protection through the Government's provision of grossly inadequate health care to tribal members. The Tribe alleges that "[t]he health care services provided to the Tribe and its members by the United

22

States qualify as an entitlement to a constitutionally protected property interest," and that "IHS has violated and continues to violate the right of the members of the Tribe to receive equal protection and due process under law in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution."  Doc. 1 at ¶¶ 70, 69.  The Government seeks dismissal of Count IV because, it argues, discretionary agency decisions about how to allocate scarce funds like those made by HHS and IHS are not actionable.  Doc. 18 at 21.  In its response brief, the Tribe states that its "equal protecti[on] and due process claims relate to the quality of services being provided at Rosebud Hospital," and that "[t]he health care services provided to the Tribe and its members qualify as an entitlement to a constitutionally protected property interest." Doc. 24 at 11.  The Tribe also requests an opportunity for discovery on the quality of services provided at the Rosebud IHS Hospital emergency department as part of its constitutional claims. See Doc. 24 at 13–14.

"[W]hile the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is 'so unjustifiable as to be violative of due process.'"  Schneider v. Rusk, 377 U.S. 163, 168 (1964) (quoting Bolling v. Sharpe, 347 U.S. 497, 499 (1954)).  The Supreme Court treats equal protection claims brought under the Fifth Amendment the same as equal protection claims brought under the Fourteenth Amendment.  Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2 (1975).

Rather than basing its constitutional claims on the amount of funding the Tribe or Rosebud IHS Hospital receives from the total IHS budget, the Tribe sits its due process and equal protection claims on the allocation of money from Congress to IHS in comparison to that provided for health care "to federal inmates and others for whom the United States has a constitutional or other legally required obligation to provide health care." Doc. 1 at ¶ 72.  Equal

23

protection challenges to allocation of funding must overcome a "strong presumption of constitutionality," subject to rational basis review. Matthew v. De Castro, 429 U.S. 181, 185 (1976). It is the Tribe's burden "to negative every conceivable basis" that could support any distinctions in funding allocations. See Heller v. Doe by Doe, 509 U.S. 312, 320 (1993) (quoting Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364 (1973)). In response to this burden, the Tribe argues that "there is no rational basis to distinguish between Indians and other groups who receive federal funding for health care, such as inmates or veterans," and supports this statement with data on per capita amounts spent for health care for each group. Doc. 24 at 6, 12. The Government argues that per capita comparison to other groups for whom the government is responsible to provide health care is inappropriate because the source of the duty to provide affirmative care differs. See Doc. 18 at 21. Indeed, in DeShaney, the Supreme Court explained that the responsibility of care provided to those in custody originates from the liberty restriction imposed as punishment; that is, "not from the State's knowledge of the individual's predicament or from its expressions of intent to help him," but instead "from the limitation which it has imposed on his freedom to act on his own behalf." DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 200 (1989).

The Government next argues that because IHS health care is not an entitlement, it has discretion in the amount of funding provided. See Doc. 18 at 23–24. The Tribe cited only one district court case in support of its argument that health care services for American Indians are entitlements in the realm of constitutionally protected property interests within the Fifth Amendment. Doc. 24 at 11-12 (citing Rincon Band of Mission Indians v. Califano, 464 F. Supp. 934, 939 n.6 (N.D. Cal. 1979)). First, there are issues with Rincon's precedential value. Rincon is a district court case from the Northern District of California that was affirmed on different

grounds.  See Rincon Band of Mission Indians v. Harris, 618 F.2d 569, 573 (9th Cir. 1980).

When Rincon was decided, the Supreme Court had yet to decide Lincoln, which affirmed IHS's

broad discretion in distributing its lump-sum appropriation.  See Lincoln, 508 U.S. at 193.

Second, Rincon is distinguishable in that it involved the equal protection rights of California

Indians in a dispute over the allocation of funding between IHS facilities, not an equal protection

argument about American Indians receiving less funds for federal health care than other non-

Indian groups. See Rincon, 464 F. Supp. at 939.

      Notwithstanding Rincon, courts have repeatedly recognized the broad discretion that

governments have in allocating funds without violating equal protection rights.  See Dandridge

v. Williams, 397 U.S. 471, 485 (1970) ("In the area of economics and social welfare, a State

does not violate the Equal Protection Clause merely because the classifications made by its laws

are imperfect.  If the classification has some 'reasonable basis,' it does not offend the

Constitution simply because the classification 'is not made with mathematical nicety or because

in practice it results in some inequality.'" (quoting Lindsley v. Natural Carbonic Gas Co., 220

U.S. 61, 78 (1911)); Jefferson v. Hackney, 406 U.S. 535, 546 (1972) ("So long as its judgments

are rational, and not invidious, the legislature's efforts to tackle the problems of the poor and the

needy are not subject to a constitutional straitjacket."); see also Quechan, 2011 WL 1211574, at

*6 (rejecting due process and equal protection claims over the closure of an IHS facility);

Hammitte v. Leavitt, No. 06-11655, 2007 WL 3013267, at *10–11 (E.D. Mich. Oct. 11, 2007)

(rejecting equal protection claims by Indians living in urban areas that their funding allocation

was significantly lower than that of rural IHS areas).

      Due process does not grant an "affirmative right to governmental aid, even where such

aid may be necessary to secure life, liberty, or property interests of which the government itself

may not deprive the individual." <u>DeShaney</u>, 489 U.S. at 196.  Although the Tribe is correct that federal courts have "recognized substantive due process claims where prisoners or civil committees—for whom the federal government is directly responsible for health care—allege that medical care has fallen below the constitutionally-prescribed level," the Tribe has not pointed to any case other than <u>Rincon</u> where a due process claim was recognized absent a custodial situation.  Doc. 1 at ¶¶ 74–75.  The Tribe has failed to allege facts to support subject matter jurisdiction or to state a claim for denial of equal protection and due process.  <u>See generally</u> <u>Carter v. Arkansas</u>, 392 F.3d 965, 969–70 (8th Cir. 2004).

**IV.     Conclusion**

For the reasons state above, it is hereby

　　　　ORDERED that Defendant's Motion to Dismiss, Doc. 17, is granted as to Counts I, II, and IV of the Complaint.  It is further

　　　　ORDERED that the Defendant's Motion to Dismiss, Doc. 17, is denied as to Count III of the Complaint.

　　　　DATED this ___31ˢᵗ___ day of March, 2017.

　　　　　　　　　　　BY THE COURT:

　　　　　　　　　　　ROBERTO A. LANGE
　　　　　　　　　　　UNITED STATES DISTRICT JUDGE