UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

ROSEBUD SIOUX TRIBE,
a federally recognized Indian tribe,
and its individual members,

       Plaintiff,

v.

UNITED STATES OF AMERICA,
DEPARTMENT OF HEALTH AND
HUMAN SERVICES, an executive
department of the United States,
ALEX M. AZAR, Secretary of Health
and Human Services, INDIAN
HEALTH SERVICE, an executive
agency of the United States,
MICHAEL D. WEAKHEE, Acting
Director of Indian Health Service,
JAMES DRIVING HAWK, Acting
Director of the Great Plains Area Indian
Health Service,

       Defendants.

Case No.: 3:16-cv-03038-RAL

**PLAINTIFF ROSEBUD SIOUX TRIBE'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

      The United States federal government continues, on a daily basis, to violate its treaty and trust duty to the Rosebud Sioux Tribe by failing to provide, pursuant to any reasonable standard, adequate healthcare at the Rosebud Hospital. The Government's arguments in opposition to summary judgment are unavailing because the Tribe has established an enforceable duty, and no trust corpus is required.

      At the outset, it is worth noting—again—that Defendants do not dispute the facts relating to the extraordinarily poor care provided at the Rosebud Hospital. The Tribe

1

provided numerous statistics and government reports showing that the overall health status of the American Indian population lags significantly behind other demographics. (*See, e.g.,* Dkt. 94 at ¶¶ 1-5; 26(a).)[1] The same is true for the American Indian population in South Dakota specifically. (*See id.* ¶ 5.)

The Tribe also pointed to specific facts—again taken from government reports—demonstrating that the care provided to the Tribe at the Rosebud Hospital does not comply with minimum federal standards, produces negative outcomes for patients, and constitutes an immediate threat to the health and safety of the Tribe's population. (*See id.* ¶¶ 10-16.) As a result of the serious deficiencies in the care provided at the Rosebud Hospital, the defendants stopped providing certain types of care entirely, such as surgery, obstetrics, and emergency services. Surgical and obstetric services remain unavailable today. (*See id.* ¶¶ 12, 14, 15.) These were not isolated incidents; diversions occurred at Rosebud nearly every year between 2000 and 2010. (*Id.* ¶ 20(a).) Thus, medical care at Rosebud Hospital is either dangerous to receive or not available.

Outside of publicly available government materials, the Tribe also provided the expert report of Dr. Donald Warne. (*See* Dkt. 94 at ¶¶ 26-27.)[2] The Government does not

---

[1] The Government admits these facts are undisputed, but contends they are "immaterial to the legal issues in this case." These facts may be immaterial to the Government's motion, but they are material to the Tribe's motion: they establish the breach of duty.

[2] The Government argues that Dr. Warne's opinions are "disputed because they constitute opinion, not material fact." This is not a basis to dispute Dr. Warne's opinions. Dr. Warne would testify at trial in a manner consistent with his written opinion, just like any other witness. The Government has not identified any expert to rebut Dr. Warne's opinions, nor has the Government pointed to any facts which counter

2

dispute Dr. Warne's qualifications as an expert in public health and American Indian healthcare. Dr. Warne reviewed publicly available reports and information and concluded that such facts "represent significant evidence of the failure of IHS to provide the highest quantity and quality of health care services to the Rosebud Tribal members." (*Id.* at ¶ 26(b).) Dr. Warne further opined that the Government is "NOT providing the quantity and quality of health services which will permit the health status of American Indians served at the Rosebud Service Unit to be raised to the highest possible level" and that the Government has failed to provide "the quantity and quality of health care services and opportunities that will eradicate their health disparities." (*Id.* at ¶ 27.) This expert testimony is unrebutted.

In addition, the Tribe provided undisputed evidence of specific instances in which the Rosebud Hospital failed to provide safe care for its patients. Dr. LeRoy Clark, at the time the clinical director for the Rosebud Hospital, agreed with CMS reports detailing instances of deficient care. (Dkt. 94 at ¶ 28.) So did Lt. Brandy Bridgewater, who at the time was the acting quality manager at the Rosebud Hospital. (*Id.* at ¶ 29.) Evelyn Espinoza testified to her experiences both as an individual with first-hand knowledge of poor care provided to her family, and in her capacity as acting CEO of the Rosebud Hospital and the Tribal Health Administrator for the Tribe. (*See id.* at ¶¶ 30-

---

or tend to disprove Dr. Warne's opinions. The Government further argues that Dr. Warne's expert opinions are somehow legal conclusions. They are not, but to the extent the Court believes there are legal conclusions mixed with expert opinions, the Court need not rely on Dr. Warne's report for the source of the legal duty owed to the Tribe. That duty is found in the Treaty and statutes, as discussed below.

33.)[3] Ms. Espinoza's testimony is evidence of (1) dangerous care, (2) failure to provide care for any condition that did not pose an immediate risk of loss of life, limb, or a sense, and (3) a systemic inability to respond to complaints or improve care.

Taken together, the undisputed evidence overwhelmingly establishes that the care provided at the Rosebud Hospital is unacceptable by any standard, including the minimum standards set by the government for the provision of health care services. Thus, if the Tribe can establish <u>any</u> duty to provide healthcare, it is undisputed that the Government is breaching that duty.

## I. The Tribe has established that Defendants have an enforceable duty to provide health care services to the Tribe.

Defendants continue to press the argument that the Tribe has not established an enforceable duty to provide health care services to the Tribe. The Government's argument misinterprets the applicable case law.

As discussed in the Tribe's opening summary judgment memorandum (and in this Court's prior opinion at Docket 36), the 1868 Treaty of Fort Laramie provides the underlying legal obligation of the federal government's trust duty to provide health care services to the Tribe. The Treaty specifically requires the government to provide health care services to the tribes *in exchange for* the Tribe ceding tribal lands to the federal government. (*See* Dkt. 36 at 18 ("In return for vast land cessations . . . .").) The

---

[3] The Government does not dispute Ms. Espinoza's testimony but objects to it for the same reasons as Dr. Warne's opinions. For the reasons discussed with respect to Dr. Warne, those objections are meritless, and the Government has failed to point to any specific facts disputing Ms. Espinoza's sworn testimony.

4

most recent Congressional affirmation of this bargained-for exchange is found in the 2016 Indian Trust Asset Reform Act:

> (4) the fiduciary responsibilities of the United States…are also founded in part on specific commitments made through written treaties and agreements securing peace, <u>in exchange for which Indians have surrendered claims to vast tracts of land, which provided legal consideration for permanent, ongoing performance of Federal trust duties</u>; and
>
> (5) the foregoing historic and Federal-tribal relations and understandings have benefitted the people of the United States as a whole for centuries and <u>have established enduring and enforceable Federal obligations to which the national honor has been committed</u>.

25 U.S.C. § 5601 (emphases added).

The Government has repeatedly reinforced its duty to provide adequate health care for Indians through legislation, including in the Snyder Act of 1921, the Indian Health Care Improvement Act of 1976 ("IHCIA"), and the Affordable Care Act ("ACA"). Taken together, the Treaty and statutes make clear that the Government has an enforceable legal duty to provide health care to the Tribe to the extent necessary "to ensure the highest possible health status for Indians." 25 U.S.C. § 1602 (2009). This duty is not the "nebulous" duty that the Government claims (*see* Dkt. 93 at 2); it is a specific bargained-for treaty and statutory obligation that the Government itself has repeatedly and clearly affirmed.

This Court has already rejected the Government's argument. In reviewing the case law on this precise issue, this Court previously ruled that the Tribe had pointed to "specific statutory language and a specific treaty" that supported its claim. (Dkt. 36 at 22.) The Court also noted that "[t]he 1868 Treaty of Fort Laramie, unlike other treaties

5

used by other tribes in attempts to enforce a health care trust responsibility, includes language relating to health care." (Dkt. 36 at 18.) In case it was not clear, the Court stated that in denying the motion to dismiss, it had determined that "there exists some duty." (Dkt. 46 at 2.)

The Court's holding that a legal duty exists was correct then and is correct now. The Government has not presented any argument as to why this Court's prior decision is wrong, other than to continue to cite the same authorities this Court previously considered. Instead, the Government attempts to dismiss this Court's prior ruling as a postponement of a decision on the merits. (Dkt. 93 at 4.) But in addressing the question of whether a duty exists, the parties are arguing a question of law, not a question of fact. The parties largely present the same authorities that this Court previously analyzed in this very case. (*See generally* Dkt. 36 at 15-22.) The Tribe's citations to long-standing legal authorities are not "unsupported self-serving allegations." (*See* Dkt. 93 at 4.) Nor does the Government explain how it would expect the Tribe to use discovery to uncover a trust or statutory responsibility. (*See* Dkt. 93 at 5.) The reality is that the existence of a duty is a question of law, not a question of fact. (*See* Dkt. 46 at 1-2 (noting that the Government was taking the position that little to no discovery would be required to address the existence of a duty).) At the motion to dismiss stage, and in this summary judgment briefing, the Tribe has shown that an enforceable duty exists. In addition, in this motion for summary judgment, the Tribe has now introduced undisputed evidence that the Government has, in fact, breached its duty.

Defendants continue to mistakenly argue that the Tribe cannot rely comprehensively on the Snyder Act, the IHCIA, the ACA, and the Treaty, and must identify a specific statute rather than a "network" of laws. (Dkt. 93 at 14-15.) But, the Court has made clear that a comprehensive framework of statutes and regulations can establish fiduciary obligations of the federal government. *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 177 (2011); *United States v. Mitchell* ("*Mitchell II*"), 463 U.S. 206, 222, 224 (1983); *see also United States v. White Mountain Apache Tribe*, 537 U.S. 465, 474 n.3 (2003) ("Where the relevant *sources* of substantive law create all of the necessary elements of a common-law trust, there is no need to look elsewhere for the source of a trust relationship.") (emphasis added).

Defendants attempt to distinguish *Mitchell II* because there, the federal government was managing a trust corpus, *i.e.*, Indian timber, land, and funds, and that the government's role was "pervasive" due to statutory guidance dictating the administration of the corpus. (Dkt. 93 at 14.) But as in *Mitchell II*, here there are a network of statutes and a treaty that establish Congress's clear intention to obligate the federal government. Here, the Government is to provide the highest level of health care services possible to tribes in exchange for the tribes ceding their tribal lands to it. To meet this duty, Congress identifies specific property, *i.e.*, the annual appropriations to IHS, that IHS must use to fulfill the Government's trust duties to the Tribe, as detailed in the Snyder Act, the IHCIA, and the Treaty, to ensure that health care provided to the Tribe permits the health status of the Tribe and its individual members to be raised to the highest possible level.

The Government's reliance on *Navajo II* is also inapposite. *See United States v. Navajo Nation*, 556 U.S. 287 (2009) ("*Navajo II*"). In *Navajo II*, the Court considered whether, taken together, the Indian Mineral Leasing Act ("IMLA") and Indian Mineral Development Act ("IMDA"), created a trust duty owed to the Tribe regarding coal leasing. In ultimately finding that no enforceable trust obligation existed, the Court construed the IMLA in light of its purpose "to enhance tribal self-determination by giving Tribes, not the Government, the lead role in negotiating mining leases." 556 U.S. at 293. The Government claims that the Tribe similarly "has the option of operating the health care programs itself by entering into a self-determination agreement." (Dkt. 93 at 17, n.3.) The Tribe's ability to elect to manage some of its health care services independently, however, is different from a statute designed to enhance tribal self-determination and does not obviate the Government of its trust duty.

The logical extension of the Government's position is that it could eliminate healthcare services to the Tribe without violating any duty. That cannot be correct. If it were, the Government's promise[4]—made in exchange for vast territorial concessions—would be meaningless. Instead, it continues to be bound by its treaty and statutory responsibilities.

The Government's responsibility to the Tribe is not a mystery. It has repeatedly declared that it will provide the health care necessary to "ensure the highest possible

---

[4] Under the Treaty, the Government had the option to terminate its healthcare obligation after ten years in exchange for an increased payment to the Tribe. (*See* Dkt. 36 at 18.) The Government never did so.

8

health status for Indians." (*See* Dkt. 36 at 19 (reviewing authorities).) The Tribe does not ask the Court to fix the IHS health care system. The Tribe does not ask the Court to create a corrective plan or staffing chart for the Rosebud Hospital. The Tribe does not ask this Court to prescribe specific remedial actions or order any allocations or other funding. All the Tribe seeks is a declaration from this Court recognizing the obvious: that the Government has a duty to "ensure the highest possible health status" for the Tribe, and that the Government is not doing so. To award that relief, the Court does not need to wade into the issue of what specific actions or medical services are required to fulfill the Government's obligation.

II. **The Tribe need not identify a particular trust corpus.**

Defendants continue to argue that the Tribe is unable to identify a trust corpus and therefore that no trust duty exists. No trust corpus, however, is required to establish a trust duty where the appropriations for IHS funding are not "gratuitous appropriations." *See Lincoln v. Vigil*, 508 U.S. 182, 195 (1993) (citing *Reuben Quick Bear v. Leupp*, 210 U.S. 50, 80 (1908) (holding that when money is appropriated pursuant to treaty duties, trust responsibility attaches). This Court already held against Defendants on this precise issue. (*See* Dkt. 36 at 18-22.) But, even if a trust corpus is required, the congressional appropriation to IHS <u>to fulfill treaty obligations</u>[5] satisfies the trust corpus requirement.

---

[5] Because IHS provides health care services pursuant to the treaty obligation created when it agreed to accept ceded tribal lands <u>in exchange for</u> providing health care services to the tribes, the IHS appropriation cannot constitute a gratuitous lump sum. The Supreme Court drew a clear distinction between a "Trust Fund" and a

9

The Tribe has established that the congressional appropriations to IHS are not "gratuitous appropriations" and therefore satisfy the trust corpus requirement. Both the Supreme Court and this Court have held that "[w]here money is appropriated to fulfill a treaty obligation, <u>a trust responsibility attaches</u>." (Dkt. 36 at 19 (emphasis addd); *see also Lincoln v. Vigil*, 508 U.S. 182, 195 (citing *Quick Bear v. Leupp*, 210 U.S. 50, 80 (1908)).) The Government is required to use the IHS appropriations to satisfy its obligations under the Snyder Act, IHCIA, and the Treaty. While the IHS retains discretion on which services to spend the monies, (*see Lincoln*, 508 U.S. at 194-95), the Supreme Court has never held that annual appropriations are always discretionary, gratuitous appropriations and cannot therefore qualify as a trust corpus.

The Government attempts to undermine the Tribe's reliance on *White v. Califano* by mistakenly arguing that *White* is no longer valid law. 437 F. Supp. at 555. In *White*, the court acknowledged that the IHS annual appropriations are sufficient to establish a trust corpus. *Id.* at 557-58. This Court not only recognized the validity of *White* but noted that it is more analogous to the instant case than the *Mitchell* line of cases relied on by Defendants because *White* similarly involved a request for specific equitable relief, rather than monetary damages. (*See* Dkt. 36 at 20.)

---

"Treaty Fund" finding that treaty funds are "moneys really belonging to the Indians. They are the price of land ceded by the Indians to the Government. The only difference is that in the 'Treaty Fund' the debt to the Indians created and secured by the treaty is paid by annual appropriations. They are not gratuitous appropriations of public moneys, but the payment, as we repeat, of a treaty debt in installments." *Quick Bear*, 210 U.S. at 81.

### III. The Tribe has established that Defendants breached their trust and treaty duties the Tribe.

Defendants owes the Tribe a statutory and treaty duty to provide health care to the Tribe that raises the health status of tribal members to the highest possible level. Defendants do not dispute the conditions at Rosebud Hospital (*see* Dkt. 94), which clearly fail to meet even minimum health care standards. Under any reasonable interpretation of what that duty requires, the facts established in this case clearly demonstrate that Defendants have breached their duty to the Tribe.

Defendants point to statistics about rural healthcare overall and suggest that this justifies their failure to fulfill their trust duty and provide adequate health care services to the Tribe. (Dkt. 93 at 21-23.) But, other rural hospitals have been able to avoid the systematic problems seen at the Rosebud Hospital. (Dkt. 94 at ¶ 33.) Indeed, a recent study found that 39 of the top 100 critical access hospitals in the country are rural hospitals in the IHS Great Plains area (Iowa, Nebraska, South Dakota, and North Dakota), six of which are in South Dakota. *See* Billion Decl. Ex. 1 (The Chartis Group, Top 100 Critical Access Hospitals 2019.)[6] In fact, the hospital in Gregory, South Dakota

---

[6] The Government cites a string of newspaper articles on pages 21-22 of Docket 93. It is unclear whether the Government is requesting that the Court take judicial notice of these articles. Under Fed. R. Evid. 201, courts may take judicial notice of newspaper articles or other publications "as evidence of what was in the public realm at the time, but not as evidence that the contents in the publication were accurate. . . . Unless the newspaper articles contain matter that has not been disputed . . . ." *See Cheval Int'l v. Smartpak Equine, LLC*, CIV 14-5010-JLV, 2015 U.S. Dist. LEXIS 23324, 2015 WL 798969, at *8 (D.S.D. Feb. 26, 2015). In this case, there is no doubt that rural healthcare can be difficult, but it is certainly not impossible. Indeed, the Gregory Hospital's success is most relevant to this case given its proximity to the Rosebud Hospital. To the extent the

11

was named one of the top twenty critical access hospitals in the United States. *See* Billion Decl. Ex. 2 (*Avera Gregory Hospital named one of top 20 Critical Access Hospitals in the nation*, Gregory Times Advocate (Sept. 4, 2019)). Despite Defendants' insistence that the Rosebud Hospital's location is to blame for its wholly deficient medical care, one of the top twenty critical access hospitals is a rural South Dakota hospital located a mere seventy-seven miles from the Rosebud Hospital. *See id.* Rosebud Hospital's failing health care services is a reflection of Defendants' breached duty to the Tribe, not a symptom of its location.

## IV. The Government's narrow construction of the duty and the nature of the Tribe's claim are inaccurate.

Next, the Government argues that the services provided to the Tribe "far exceed" its treaty duty, claiming that the Treaty requires only that Defendants provide a single physician and housing for the same. (Dkt. 93 at 27.) Again, the Government misapprehends its obligation by reading the Treaty in isolation. Congress has repeatedly clarified and affirmed the Government's obligation, declaring that it is the policy of the United States "in fulfillment of its special trust responsibilities and legal obligations to Indians – [] to ensure the highest possible health status for Indians and urban Indians and to provide all resources necessary to effect that policy." 25 U.S.C. § 103 (2009); *see* 25 U.S.C. § 1602(1) (the IHCIA's purpose is "to ensure the highest possible health status for Indians . . . and to provide all resources necessary to affect that

---

Court considers the articles provided by the Government, it should also consider the article attached as Exhibit 1 to the November 12, 2019 Billion Declaration.

policy"). For the Government to suggest it has satisfied its obligations and provided *all necessary resources* to the dangerously understaffed and underfunded Rosebud Hospital is untenable.

Finally, while the woefully inadequate care provided at the Rosebud Hospital may rise to the level of medical "malpractice," the Tribe has not alleged malpractice as the basis of Defendants' breach of trust, as Defendants argue. (Dkt. 93 at 25-26.) Under *any* reasonable interpretation of what the Government's statutory and treaty duty to provide health care to the Tribe requires, the Tribe has established that the Government breached its duties to the Tribe.

## V. The Tribe has standing because its injury can be redressed by a favorable decision from this Court.

The Tribe seeks a declaratory judgment that the Government is responsible for providing health care to the Tribe and has failed to comply with its trust and treaty duties. Defendants argue that the relief sought by the Tribe has no "purely mechanical result" and therefore is "entirely speculative." (Dkt. 93 at 30.) Unlike in *Mississippi River Revival, Inc.* where the court held that the requested declaration that past conduct violated rights was inappropriate, the Government's misconduct in this case is ongoing. *See Mississippi River Revival, Inc. v. City of Minneapolis*, 145 F. Supp. 2d 1062, 1065 (D. Minn. 2001). It is not mere conjecture to assume a declaration confirming the Government's trust and treaty responsibilities and its failure to fulfill them would lead to a change in its behavior and a change in the relationship between the parties. Indeed, this Court acknowledged the likelihood of that exact possibility, finding that: "a

declaratory judgment stating that defendants, which include IHS and others directly responsible for providing health care to the Rosebud Sioux Tribe, have failed to comply with the trust and treaty responsibilities . . . could . . . have an effect on the defendants' behavior towards the Tribe, even if indirectly." (*See* Dkt. 36 at 12).

Further, Defendants' suggestion that granting the Tribe's declaration would create for all private citizens a "freestanding right to obtain some hypothetical level of funding for their favorite agency and to direct those funds to their favorite agency field office" is nothing more than hyperbole. (*See* Dkt. 93 at 31.) As the Tribe has repeatedly clarified, it does not seek a declaration reallocating or otherwise addressing the allocation of funds to the Tribe or to Rosebud Hospital. In addition, the claim here is not a "freestanding" one—it is explicitly based on a treaty and myriad statutes affirming the Government's bargained-for commitment to the Tribe. Enforcing the Government's promise in this case will not create a "freestanding right" for all private citizens—just those who are parties to a treaty with the Government. The Tribe has established that it has standing for the narrower declaratory relief it seeks—a declaration that confirms the Government owed the Tribe trust and treaty duties and failed to fulfill them.

## VI. This Court has jurisdiction over Count III.

Defendants maintain their argument regarding jurisdiction that this Court cannot hear claims against the United States requiring the payment of money. (Dkt. 93 at 32). Defendants' argument mischaracterizes the relief sought by the Tribe. The Tribe is not seeking a forced expenditure of funds, or for a reallocation of funds to the Rosebud Hospital. Rather, Count III seeks only a declaratory judgment that IHS has

14

violated its trust duty to ensure that health services provided to the Tribe's members permit the health status of Indians to be raised to the highest possible level. As discussed above, this remedy can be achieved without ordering allocation of additional funds.

**CONCLUSION**

Because of the Government's refusal to comply with its treaty and statutory obligations, the conditions at the Rosebud Hospital are woefully inadequate. The Government's continued efforts to evade its trust obligation to provide adequate health care to the Tribe are unacceptable and unsupported by law. The Tribe simply asks this Court to declare that the Government has a duty to the Tribe, and that the Government is breaching its duty. Accordingly, the Tribe respectfully requests that Defendants' motion for summary judgment be denied and that summary judgment be entered in the Tribe's favor in the form of a declaratory judgment.

Dated: November 12, 2019					**ROBINS KAPLAN LLP**

By: */s/ Timothy W. Billion*
    Brendan V. Johnson (S.D. #3263)
    Timothy W. Billion (S.D. #4641)
    140 North Phillips Avenue, Suite 307
    Sioux Falls, SD 57104
    Tel: 605-335-1300
    Fax: 605-740-7199
    BJohnson@RobinsKaplan.com
    TBillion@RobinsKaplan.com

    Denise S. Rahne (S.D. #4708)
    Bruce A. Finzen (*Pro Hac Vice*)
    800 LaSalle Avenue, Suite 2800
    Minneapolis, MN 55402-2015
    Tel: 612-349-8500
    Fax: 612-339-4181
    DRahne@RobinsKaplan.com
    BFinzen@RobinsKaplan.com

    Timothy Q. Purdon (*Pro Hac Vice*)
    1207 West Divide Avenue, Suite 200
    Bismarck, ND 58503
    Tel: 701-255-3000
    Fax: 612-339-4181
    TPurdon@RobinsKaplan.com

**ATTORNEYS FOR PLAINTIFF
ROSEBUD SIOUX TRIBE**