UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| ROSEBUD SIOUX TRIBE, A FEDERALLY RECOGNIZED INDIAN TRIBE, AND ITS INDIVIDUAL MEMBERS, | 3:16-CV-03038-RAL |
| Plaintiff, | OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT |
| vs. | |
| UNITED STATES OF AMERICA, DEPARTMENT OF HEALTH AND HUMAN SERVICES, an executive department of the United States; ALEX M. AZAR II, Secretary of Health and Human Services; INDIAN HEALTH SERVICE, an executive agency of the United States; MICHAEL D. WEAHKEE, Principal Deputy Director of Indian Health Service; JAMES DRIVING HAWK, Director of the Great Plains Area Indian Health Service, | |
| Defendants.[1] | |

On December 5, 2015, Indian Health Services (IHS) placed the Rosebud IHS Hospital

Emergency Department in Rosebud, South Dakota, on "divert status." Doc. 1 at ¶ 37. This action

prompted the Rosebud Sioux Tribe (the Tribe) to file a Complaint against the United States of

America, the Department of Health and Human Services (HHS) and its Secretary, the IHS and its

Acting Director, and the Acting Director of the Great Plains Area of IHS (collectively the

---

[1] Applying Rule 25(d) of the Federal Rules of Civil Procedure, this Court has corrected the spelling of one Defendant's name and updated the titles of the public officials named as Defendants.

Government) for declaratory and injunctive relief, alleging violations of the Indian Health Care Improvement Act (IHCIA); the Administrative Procedures Act (APA); treaty, statutory, and common law trust duties; and equal protection and due process. Doc. 1. The Government re-opened the Rosebud IHS Hospital Emergency Department and then moved to dismiss based on jurisdictional grounds and for failure to state a claim upon which relief could be granted. Doc. 17. This Court dismissed all claims except those based on the treaty, statutory, and common law trust duties owed to the Tribe. Doc. 36. The parties have engaged in discovery and now move this Court for summary judgment. Docs. 80, 88. For the reasons stated herein, the Government's motion for summary judgment is denied and the Tribe's motion for summary judgment is granted in part and denied in part.

## I.    Summary Judgment Standard

"A party may move for summary judgment," which a court shall grant, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. When ruling on a motion for summary judgment, "a court must view the evidence in the light most favorable to the nonmoving party." U.S. ex rel. Bernard v. Casino Magic Corp., 374 F.3d 510, 513 (8th Cir. 2004) (quotation omitted). On cross motions for summary judgment, a court's normal course is to "consider each motion separately, drawing inferences against each movant in turn." E.E.O.C. v. Steamship Clerks Union, Local 1066, 48 F.3d 549, 603 n.8 (1st Cir. 1995). Because the parties have differing views on which facts are relevant to the legal claims at issue, this Opinion and Order sets forth the facts from each party's perspective separately and, of course, construes those facts in the light most favorable to the nonmoving party when considering each motion for summary judgment.

## II.    Factual Background

### A. Undisputed Facts Relevant from the Government's Perspective

On April 29, 1868, the United States entered into the Treaty of Fort Laramie[2] with the Great Sioux Nation seeking to end hostilities between what the Government called the Sioux tribes (more accurately, Lakota, Nakota, and Dakota peoples) and the United States. Doc. 92 at ¶ 2. The 1868 Treaty of Fort Laramie involved multiple tribes, including what now is called the Rosebud Sioux Tribe,[3] a federally recognized tribe. Doc. 92 at ¶¶ 1, 2. As a federally recognized tribe, the Tribe's members are eligible to receive health care services from IHS. Doc. 92 at ¶ 1.

IHS is the federal agency operating under the U.S. Department of Health and Human Services (HHS) that provides health care services to American Indians and Alaska Natives throughout the United States. Doc. 1 at ¶ 6; Doc. 92 at ¶¶ 3, 5. Congress funds IHS through annual appropriations to the U.S. Department of the Interior, and the agency receives lump-sum appropriations for services, facilities, and contract support costs. Doc. 92 at ¶¶ 3, 7; Doc. 83-6 at 2. IHS maintains a Headquarters Office and twelve Area Offices with service units operating within each Area. Doc. 92 at ¶ 4. Area Offices oversee health care facilities in specific geographic areas and are responsible for distributing funds to facilities, monitoring operations, and providing guidance and technical assistance. Doc. 91-25 at 11–12. IHS provides health care services through

---

[2] There were two separate treaties executed at Fort Laramie, one in 1851 and the one at issue in 1868 that followed a series of wars. To avoid any confusion, the Court refers to the "1868 Treaty of Fort Laramie" or the "Treaty" to reference the latter treaty signed at Fort Laramie.

[3] The Rosebud Sioux Tribe is comprised of the Sicangu Oyate people, part of what the United States had considered to be the Sioux Indian Tribe. One of the signatories to the 1868 Treaty of Fort Laramie was listed as "ZIN-TAH-GAH-LAT-WAH" (Sinte Gleska) or Spotted Tail, a famous chief and respected leader of the Sicangu Oyate. Sinte Gleska, by all accounts an effective and resourceful leader, likely was not proficient in reading or writing, what was to him, the foreign language of English. Sinte Gleska and all other Native Americans who signed the Treaty simply signed "X."

federally-operated facilities and through contracts and grants to tribes, tribal organizations, and urban Indian organizations. Doc. 92 at ¶ 5. The Rosebud IHS Hospital is a service unit in Rosebud, South Dakota, that operates under the Great Plains Area and provides health care services to the Tribe's members and other IHS beneficiaries. Doc. 92 at ¶ 10. IHS is the payer of last resort, meaning that all other health care resources like private insurance, state health programs, and other federal programs must be exhausted before IHS resources are used. Doc. 92 at ¶ 6.

IHS uses a "bottom's up process" for developing its annual budget proposal. Doc. 92 at ¶ 9. Every Area Office asks the tribes in its Area for their budget priorities and then representatives from at least two tribes from each Area meet in Washington D.C. to consult and develop one set of national, tribal budget recommendations. Doc. 92 at ¶ 9. IHS then submits its budget request to HHS which in turn submits the Department's request to the Office of Management and Budget. Doc. 92 at ¶ 8. After reviewing budget requests, meeting with agencies, and deliberating, the Office of Management and Budget finalizes the President's budget request which is submitted to Congress. Doc. 92 at ¶ 8.

On November 23, 2015, the Centers for Medicare and Medicaid Services (CMS) notified the Rosebud IHS Hospital that the service unit was out of compliance with the Medicare conditions of participation and that CMS intended to terminate the unit's participation in the Medicare Program the following month. Doc. 94 at ¶ 11. The Rosebud IHS Hospital Emergency Department was placed on divert status on December 5, 2015. Doc. 94 at ¶ 12. The Emergency Department reopened on July 15, 2016. Doc. 19-8. IHS worked with CMS to improve the conditions at the Rosebud IHS Hospital and satisfactorily completed a Systems Improvement Agreement in September 2017. Doc. 92 at ¶ 16. At various times, although somewhat inconsistently, IHS has employed physicians, nurses, physician assistants, medical assistants, lab

technicians, x-ray technicians, medical records health care information specialists, and contract employees to provide services at the Rosebud IHS Hospital. Doc. 92 at ¶ 15.

After this Court granted in part the Government's motion to dismiss, the Tribe's only remaining claim alleged a violation of treaty, statutory, and common law trust duties. Doc. 36 at 22; Doc. 92 at ¶ 17. Through discovery, the Government submitted interrogatories that asked the Tribe to define the scope of the duty it allegedly owes to the Tribe and to cite specific sources of law that establish that duty, but the Tribe objected to those interrogatories because they relate to issues of pure law. Doc. 92 at ¶¶ 18–25. The Government now moves for summary judgment on the grounds that the Tribe cannot identify a substantive source of law which establishes that the Government has a duty to provide health care to the Tribe, that the Tribe lacks standing, and that this Court lacks jurisdiction. Doc. 81.

**B. Undisputed Facts Relevant from the Tribe's Perspective**

Despite IHS's mission to raise the physical, mental, social, and spiritual health of American Indians and Alaska Natives to the highest level, health disparities and inadequate health care for those populations continue. Doc. 94 at ¶ 1. Federally-operated IHS facilities have seen a significant increase in their user populations over the last three decades, and between fiscal years 1986 and 2013, the population of registered users across the 28 IHS hospitals has increased by 70%, compared to the overall United States population growth of only 32% during that time period. Doc. 94 at ¶ 1(b); Doc. 91-1 at 7–8. Reports have found long-standing challenges at IHS facilities that affect the agency's ability to provide quality care, including problems with ensuring access to needed care, maintaining clinical competence, recruiting and retaining essential staff, monitoring and providing oversight to contracted providers, and utilizing outdated buildings and equipment. Doc. 94 at ¶¶ 1(a), 1(c); Doc. 91-1 at 13–14, 17. Healthy People 2020, an HHS initiative, found

that Americans with access to comprehensive quality health care services have better health outcomes, fewer health disparities, and greater patient-provider relationships. Doc. 94 at ¶ 2; Doc. 91-2. IHS has recognized that American Indians and Alaska Natives experience lower health status, lower life expectancy,[4] and disproportionate disease burdens compared to other Americans. Doc. 70-1 at 5; Doc. 94 at ¶ 3.

The Rosebud IHS Hospital is a service unit under the supervision of the Great Plains Area of IHS. See Doc. 91-13. The facility is located on the Rosebud Indian Reservation in south-central South Dakota, and it provides health care services to approximately 28,000 Native Americans with various conditions. Doc. 91-18. It is the primary means of health care for Native Americans in the area, and the Tribe's members depend heavily on Rosebud IHS Hospital and its staff for health care services. Doc. 91-18.

A 2016 report from HHS sets forth several statistics relative to the health disparities between American Indians and Alaska Natives and other populations and breaks down some of those disparities by states. Doc. 91-5. Between the years 2012 and 2014, the infant death rate per 1,000 live births among all races in the United States was 5.9, the rate among the white population was 5.0, and the rate was 7.9 for the American Indian or Alaska Native population. Doc. 94 at ¶ 5(a); Doc. 91-5 at 110–11. In South Dakota during that time frame, the rate was 6.8 for all races, 5.5 for the white population, and 11.7 for American Indians or Alaska Natives. Doc. 94 at ¶ 5(a); Doc. 91-5 at 110–111. Between 2013 and 2015, the age-adjusted death rate per 100,000 in South

---

[4] According to an IHS document titled "Indian Health Disparities," "American Indians and Alaska Natives born today have a life expectancy that is 5.5 years less than the U.S. all races population." Doc. 91-3. The demographic group in the United States with the lowest life expectancy is the Native American male. Elizabeth Arias, Jiaquan Xu, & Melissa A. Jim, Period Life Tables for the Non-Hispanic American Indian and Alaska Native Population, 2007–2009, American Journal of Public Health (June 2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4035861.

Dakota was 701.7 for all persons, 664.1 for the white population, and 1,283.2 for the American Indian or Alaska Native population. Doc. 94 at ¶ 5(b); Doc. 91-5 at 118. Between 1980 and 2015, the number of deaths for all persons increased approximately 1.36 percent, for whites the number increased approximately 1.33 percent, and for American Indians or Alaska Natives the number of deaths increased approximately 2.75 percent. Doc. 91-5 at 128–29.

The United States Commission on Human Rights has published reports relating to federal funding for IHS in 2003 and 2018. Doc. 94 at ¶¶ 6–7. The 2003 report found that the IHS budget had not kept pace with the growing needs of its service population. Doc. 94 at ¶ 6. Although the overall amount allocated to the Rosebud IHS Hospital increased by more than 11.5% between 2010 and 2017, allocations for some budget line items for the facility decreased, notably for "hospitals and clinics (clinical services)." Doc. 91-8. According to Elizabeth Fowler, the Deputy Director for Management Operations of the IHS, the line item "hospitals and clinics" is the "major funding support for a hospital or clinic," and pays for salaries and supplies among other expenses. Doc. 91-9.

On November 23, 2015, after completing a survey of the facility, CMS notified Rosebud IHS Hospital's acting administrator that it was out of compliance with CMS's conditions of participation. Doc. 94 at ¶ 11; Doc. 91-11. CMS determined that the deficiencies at the facility constituted "an immediate and serious threat to the health and safety of patients," and gave notice that CMS intended to terminate Rosebud IHS Hospital's participation in its program on December 12, 2015, unless the conditions were abated. Doc. 91-11 at 1. On December 4, 2015, IHS informed Rosebud Sioux Tribal President William Kindle that the Rosebud IHS Hospital Emergency Department would be placed on "divert status" on December 5, 2015, due to staffing changes and limited resources. Doc. 94 at ¶ 12; Doc. 91-12. The letter sent to President Kindle suggested that

individuals in need of emergency assistance call 911 for possible ambulance dispatch or go to the nearest emergency room in either Winner, South Dakota, or Valentine, Nebraska; both of these locations are approximately 50 miles from the town of Rosebud. Doc. 91-12. On December 17, 2015, IHS announced that due to staffing changes the Rosebud IHS Hospital's Urgent Care Facility would no longer operate 24 hours per day but would instead be open from 7:00 a.m. until midnight seven days per week. Doc. 94 at ¶ 13; Doc. 91-13. Beginning in July 2016, Rosebud IHS Hospital diverted obstetrics patients and referred them to hospitals in Winner or Valentine due to a shortage of physicians, nurses, and nurse anesthetists. Doc. 94 at ¶ 14(b); Doc. 91-14 at 18. In June 2016, Rosebud IHS Hospital also closed and diverted all surgical services. Doc. 94 at ¶ 15; Doc. 91-15. On July 15, 2016, the Rosebud IHS Hospital's Emergency Department resumed 24-hour operations. Doc. 19 at ¶ 16.

A 2010 report to the Senate Committee on Indian Affairs related that the Great Plains Area[5] had a history of diverting health care service at its service units, including the Rosebud IHS Hospital, which impacts the consistency and level of care the units provide to patients. Doc. 94 at ¶ 20(a); Doc. 91-21 at 20–21. The report also identified IHS facilities in the Great Plains Area that received poor evaluations and risked loss of accreditation with CMS. Doc. 94 at ¶ 20(b); Doc. 91-21 at 23. According to the report, "[a]ccreditation is the process through which hospitals and other health care facilities are evaluated on their quality of care, treatment and services provided, based on established standards of performance in the health care industry." Doc. 91-21 at 23. The

---

[5] At the time of the 2010 report, the Area office was named the Aberdeen Area. Since that time, it has been renamed the Great Plains Area. Doc. 91-22 at 1.

report specifically found that Rosebud IHS Hospital had "a troubling record of repeat poor evaluations." Doc. 94 at ¶ 20(b); Doc. 91-21 at 24.[6]

Evelyn Espinoza, a registered nurse who began working at Rosebud IHS Hospital in 2005, served as the accreditation specialist for the facility for a time and has worked as the Tribal Health Administrator for the Rosebud Sioux Tribe since 2014. Doc. 94 at ¶ 30; Doc. 91-29 at 4–5, 9. At her deposition in this case, Ms. Espinoza testified that she has submitted numerous patient complaints to IHS but never received a response. Doc. 94 at ¶ 31; Doc. 91-29 at 11–12. She also described the process by which IHS arranges services through the Purchased/Referred Care Program. Doc. 91-29 at 21–22. She explained that when an IHS facility cannot provide a needed service, it will refer the patient to another facility that can provide that service. Doc. 91-29 at 21. However, she said that IHS typically only pays for referrals to other providers if the patient has an immediate risk of loss of life, limb, or a sense; and if the patient cannot afford to seek help at another facility, IHS provides less effective treatment options according to Ms. Espinoza. Doc. 94 at ¶ 32; Doc. 91-29 at 20–22.

Throughout the early months of 2017, congressional committees received reports and heard testimony about the status of Indian health care across the United States. In January 2017, the Government Accountability Office (GAO) submitted a report to the United States Senate Indian Affairs Committee which found that "[a]s a result of IHS's lack of consistent agency-wide quality performance standards, as well as the significant turnover in area leadership, IHS officials cannot

---

[6] The Tribe's statement of undisputed material facts describes a specific incident referenced in this report. The incident involves a pregnant patient who came to the Rosebud IHS Hospital Emergency Department with contractions, was triaged as urgent, but ultimately discharged 90 minutes later. She then went to the Outpatient Department, was told to walk around and complete a urinalysis, and delivered her baby in the Outpatient Clinic bathroom 41 minutes after being discharged from the Emergency Department. Doc. 94 at ¶ 20(c).

ensure that facilities are providing quality health care to their patients." Doc. 94 at ¶ 25; Doc. 91-26 at 15. In February of 2017, the GAO issued a report regarding various federal agencies' progress in high risk areas. Doc. 94 at ¶ 23; Doc. 91-24. In the report, the GAO added three areas to the High-Risk List, one of which pertained to federal programs that serve tribes and their members. Doc. 91-24 at 2. The report stated that among other federal agencies' inadequacies, "the Department of Health and Human Services' Indian Health Service, ha[s] ineffectively administered... health care programs." Doc. 94 at ¶ 23; Doc. 91-24 at 2. On May 17, 2017, Melissa Emrey-Arras, Director of Education, Workforce, and Income Security at the GAO, testified before the Senate Committee on Indian Affairs that none of the 14 recommendations the GAO made to HHS in February 2017 to improve management of IHS facilities had been addressed, but that IHS had taken several actions in response to the GAO's recommendations. Doc. 91-25 at 32.

In July of 2019, the Office of Inspector General (OIG) released a case study about IHS's closure of the Rosebud IHS Hospital in 2016. Doc. 94 at ¶ 10; Doc. 91-10. The study found that IHS's handling of the closure of Rosebud IHS Hospital's Emergency Department was "problematic and had negative consequences for the affected parties." Doc. 94 at ¶ 10(a); Doc. 91-10 at 30. However, the study also noted the precursors to the closure, specifically the facility's inability to meet the CMS's conditions of participation. Doc. 94 at ¶ 10(a); Doc. 91-10 at 30. The OIG found that staffing inadequacies and changing leadership were longstanding issues that contributed to the noncompliance which occurred before, during, and after the closure. Doc. 94 at ¶ 10(a); Doc. 91-10 at 30. The study noted that in September of 2018, Rosebud IHS Hospital had 69 vacancies that were mostly filled by contracted providers and that between the Emergency Department's reopening in July 2016 and September 2018, the service unit had had six CEOs,

three Clinical Directors, and nine Directors of Nursing. Doc. 94 at ¶ 10(b); Doc. 91-10 at 27; 19 at ¶ 16. The study stated that CMS surveyors expressed concern over Rosebud IHS Hospital's ability to maintain compliance with its conditions of participation. Doc. 91-10 at 28. Over the years, the surveyors noticed a pattern in IHS's response to deficiencies at Rosebud IHS Hospital where the agency would assign top-performing teams from across the agency to resolve the deficiencies quickly, but once these teams were replaced with different leadership the problems would resurface. Doc. 94 at ¶ 10(c); Doc. 91-10 at 28. The OIG study identified five factors that contributed to Rosebud IHS Hospital's continued lapses in compliance: continuing turnover in hospital leadership, insufficient transition of new hospital leaders, continuing difficulty maintaining staff, corrective actions not engrained, and inability of IHS to provide sustained attention. Doc. 94 at ¶ 10(d); Doc. 91-10 at 29.

In August 2018, the GAO issued a report to the Senate Indian Affairs Committee regarding vacancies of medical providers in eight IHS Areas. Doc. 94 at ¶ 14; Doc. 91-14. The report noted that IHS officials explained how "the rural locations and geographic isolation of some IHS facilities create recruitment and retention difficulties," a widespread issue among rural health care facilities nationwide. Doc. 91-14 at 17; Doc. 95-2 at 475–76. The report also recorded that IHS employees told them that "long-standing vacancies have a direct negative effect on patient access to quality health care, as well as employee morale," and that "they have experienced... negative effects on patient care and provider satisfaction when positions are vacant." Doc. 94 at ¶¶ 14(a), 14(d); Doc. 91-14 at 17–18. To address the vacancies, some Area Offices contract with temporary providers to fill these positions at service units; however, officials at these facilities feel that persistent turnover in temporary staff may jeopardize continuity of care. Doc. 94 at ¶ 14(e); Doc. 91-14 at 33. According to the CEO Monthly Report, in May 2018, when only counting federal

employees, the vacancy rate at Rosebud IHS Hospital was 45 percent for physicians, 33 percent for physician assistants, 25 percent for nurse practitioners, zero percent for dentists and pharmacists, and 31 percent for nurses. Doc. 94 at ¶ 17; Doc. 91-17. However, when factoring in positions filled by contractors, there was a zero percent vacancy rate for physicians, nurse practitioners, dentists, and pharmacists; a 33 percent vacancy rate for physician assistants; and a 31 percent vacancy rate for nurses.[7] Doc. 91-17.

During Rosebud IHS Hospital's attempt to avoid termination from participation in the CMS program, CMS sent quality monitors to the facility to oversee its progress toward abating deficiencies. Doc. 94 at ¶ 18; Doc. 91-18. The quality monitors issued reports relative to their findings. Doc. 91-18. The report dated November 11, 2016, found that the CEO, Clinical Director, Chief of Quality Improvement, and other leadership positions were unfilled. Doc. 94 at ¶ 18(a); Doc. 91-18. According to the December 16, 2016 report, "[f]requent changes in leadership can create barriers to important patient safety and quality participation by staff." Doc. 94 at ¶ 18(b); Doc. 91-18.

CMS conducted a complaint survey of the Rosebud IHS Hospital in July 2018 and again found deficiencies that constituted "an immediate and serious threat to the health and safety of patients." Doc. 94 at ¶ 16; Doc. 91-16. CMS placed the facility on Immediate Jeopardy status.

## III. Discussion

### A. The Applicable Duty

The Supreme Court of the United States has repeatedly recognized "the undisputed existence of a general trust relationship between the United States and the Indian people." United

---

[7] The real numbers are that six of the eleven physician positions were filled by federal employees and the remaining five were filled by contractors, and three of the four physician assistants were federal employees and the remaining one was filled by a contractor.

States v. Mitchell, 463 U.S. 206, 225 (1983) (Mitchell II); United States v. Navajo Nation, 537 U.S. 488, 506 (2003) (Navajo Nation I); United States v. Jicarilla Apache Nation, 564 U.S. 162, 176 (2011). However, that general trust relationship alone cannot sustain a tribe's cause of action for breach of trust when the tribe seeks money damages. Navajo Nation I, 537 U.S. at 506. Rather, a tribe must point to a substantive source of law imposing specific duties upon the Government and allege that the Government failed to perform those duties. United States v. Navajo Nation, 556 U.S. 287, 290 (2009) (Navajo Nation II). The source of law that a tribe points to—whether a treaty provision, agreement, executive order, or statute—need not state in specific terms that a trust relationship exists because "[t]he existence vel non of the relationship can be inferred from the nature of the transaction or activity." Navajo Tribe of Indians v. United States, 624 F.2d 981, 987 (Ct. Cl. 1980).

The Tribe is not seeking money damages in its complaint. When a tribe, as here, seeks equitable relief rather than money damages, it still must point to a substantive source of duty-imposing law and allege that the Government breached that duty. Blue Legs v. U.S. Bureau of Indian Affairs, 867 F.2d 1094, 1100 (8th Cir. 1989). In doing so, the source of law again need not explicitly state that a trust duty exists because "[t]he existence of a trust duty between the United States and an Indian or Indian tribe can be inferred from the provisions of a statute, treaty or other agreement, 'reinforced by the undisputed existence of a general trust relationship between the United States and the Indian people.'" Id. (quoting Mitchell II, 463 U.S. at 225). To determine whether the United States has an equitable obligation to an Indian tribe "depends upon the interpretation of the terms of some authorizing document (e.g. statute, treaty, executive order)." Navajo Tribe of Indians, 624 F.2d at 988 (citation omitted).

In its brief in support of its motion for summary judgment, the Tribe points to language in the 1868 Treaty of Fort Laramie, the Snyder Act of 1921, and the Indian Health Care Improvement Act (IHCIA) as substantive sources of law imposing a duty on the Government to provide the Tribe with adequate health care. Doc. 89 at 26–27. The Tribe seeks equitable relief in the form of a declaratory judgment that the "Government is not fulfilling its treaty and statutory obligations to provide the quantity and quality of health care that will raise the health of tribal members to the highest level, and eliminate health disparities suffered by the Tribe." Doc. 89 at 40–41. The first step in this Court's analysis then is to look to the terms of the sources of law put forward and to determine whether a duty exists and the scope of that duty under applicable Supreme Court precedents. See Navajo Tribe of Indians, 624 F.2d at 988. When conducting such an inquiry, a court resolves ambiguities in statutes and treaties in favor of the Tribe. Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766 (1985) ("[S]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."); Oneida County, N.Y. v. Oneida Indian Nation of New York States, 470 U.S. 226, 247 (1985) ("[I]t is well established that treaties should be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." (citations omitted)).

Taking the sources of law cited by the Tribe chronologically, the 1868 Treaty of Fort Laramie first addressed health care for the Tribe and its members. The 1868 Treaty of Fort Laramie provides that in exchange for mutual peace and vast forfeiture of land by the Sioux Nation, "[t]he United States hereby agrees to furnish annually to the Indians the physician... and that such appropriations shall be made from time to time, on the estimate of the Secretary of the Interior, as

will be sufficient to employ such persons."[8] 1868 Treaty of Fort Laramie, art. XIII. The United States also agreed to provide "a residence for the physician" under the Treaty. Id. art. IV. There is no issue in this case about housing for IHS medical staff in Rosebud. The Treaty's terms allow the United States to withdraw the physician after ten years, but only if it paid an additional $10,000 per year. Id. art. IX. Neither party has argued or put forth evidence that the Government withdrew from its obligation by paying the annual sum in lieu of providing the physician and housing for the physician.

Since the 1868 Treaty of Fort Laramie, Congress has enacted legislation related to Indian health care nationally using more general terms. The Snyder Act of 1921 instructs federal agencies to "direct, supervise, and expend such moneys as Congress may from time to time appropriate, for" among other things, "relief of distress and conservation of health" of Indians throughout the United States. 25 U.S.C. § 13. Congress enacted the IHCIA in 1976 and amended it in 2010 such that it now "declares that it is the policy of this Nation, in fulfillment of its special trust responsibilities and legal obligations to Indians to ensure the highest possible health status for Indians and urban Indians and to provide all resources necessary to effect that policy." 25 U.S.C. § 1602. The IHCIA contains both broad, aspirational language relating Congress's findings on and goals for Indian health care, as well as specific directives for health care program implementation. Compare 25 U.S.C. §§ 1601–02 (setting forth various goals relating to Indian health) with 25 U.S.C. §§ 1621b(a), 1621k, 1665c (setting forth specific programs or services the Secretary "shall" implement or provide).

---

[8] Article XIII of the Treaty listed certain skilled service providers the United States would supply besides the physician.

The Supreme Court on several occasions has addressed the United States' trust and treaty responsibilities to Indian tribes. When the Supreme Court decided Quick Bear v. Leupp, 210 U.S. 50, 66 (1908), in 1908, it recognized the difference between Congress's gratuitous appropriations, to which no trust responsibility attaches, and appropriations made to fulfill treaty obligations, to which a trust duty does attach. In Quick Bear, the Supreme Court differentiated between Congressional appropriations for Indian education made under two separate headings in the appropriation acts it reviewed; the Court found that money appropriated under one heading constituted gratuitous public funds, while that appropriated under the other was "not gratuitous appropriations of public moneys, but the payment, as we repeat, of a treaty debt in installments." Id. at 66, 81.

The Supreme Court also has addressed when a federal statute provided the basis for a governmental trust duty to a tribe. In United States v. Mitchell, a case which came before the Supreme Court twice, the Court considered whether and to what extent the Government had a duty to manage the timber resources located on the Quinault Reservation. United States v. Mitchell, 445 U.S. 535 (1980) (Mitchell I); United States v. Mitchell, 463 U.S. 206 (1983) (Mitchell II). Mitchell I focused on an alleged fiduciary duty under the General Allotment Act of 1887, which divvied up the reservation land among individual Indians. Mitchell I, 445 U.S. at 537–38. After looking at the various provisions of the General Allotment Act and its history, the Supreme Court concluded that it "created only a limited trust relationship between the United States and the allottee that does not impose any duty upon the Government to manage timber resources." Id. at 542. The Supreme Court determined that the United States held the land in trust under the act, not to create a fiduciary duty to manage the land in a particular way, but to prevent alienation of the land and to protect it from state taxation. Id. at 544. Although the General Allotment Act did not

sustain the plaintiffs' claim for breach of trust in <u>Mitchell I</u>, the Supreme Court left open whether some other source of law could establish those rights and duties. <u>Id.</u> at 546. In <u>Mitchell II</u>, the Indian plaintiffs based their claim "on various Acts of Congress and executive department regulations." <u>Mitchell II</u>, 463 U.S. at 219. In <u>Mitchell II</u>, the Supreme Court found that "[i]n contrast to the bare trust created by the General Allotment Act, the statutes and regulations now before us clearly give the Federal Government full responsibility to manage Indian resources... thereby establish[ing] a fiduciary relationship and defin[ing] the contours of the United States' fiduciary responsibilities." <u>Id.</u> at 224. Although the Supreme Court in <u>Mitchell II</u> noted that "a fiduciary duty necessarily arises when the Government assumes such elaborate control over forests and property belonging to Indians," it does not make such control a prerequisite to establish a trust relationship. <u>Id.</u> at 225.

The question of whether Congressional enactments imposed a fiduciary duty to a tribe came before the Supreme Court again in <u>United States v. Navajo Nation</u>, 537 U.S. 488 (2003) (<u>Navajo Nation I</u>), and <u>United States v. Navajo Nation</u>, 556 U.S. 287 (2009) (<u>Navajo Nation II</u>). In these cases, the Navajo Nation alleged that the Government breached a fiduciary duty when it approved a mineral lease negotiated by the tribe. <u>Navajo Nation I</u>, 537 U.S. at 493. The Supreme Court considered the substantive sources of law put forth by the tribe in light of <u>Mitchell I</u> and <u>Mitchell II</u> and determined that the sources related more closely to the general, nonduty imposing provisions at issue in <u>Mitchell I</u>, and "neither assigned a comprehensive managerial role nor... expressly invested [the Secretary] with [certain] responsibilit[ies]." <u>Id.</u> at 507.

The Supreme Court in <u>Lincoln v. Vigil</u>, 508 U.S. 182 (1993), considered a case brought by tribal members under the Snyder Act, the IHCIA, and the APA against IHS relating to IHS appropriations. In <u>Lincoln</u>, Navajo and Hopi tribal members sued after the IHS decided to

discontinue a program servicing handicapped Indian children in the Southwest in order to reallocate funds for a nationwide program to assist Native American children. Id. at 184. Although the Court noted that the Snyder Act and the IHCIA "speak about Indian health only in general terms," it still referenced IHS's "statutory mandate to provide health care to Indian people." Id. at 194. The Court's discussion in Lincoln focused on its ability to review IHS's decision under the Administrative Procedures Act and whether notice-and-comment rulemaking procedures should have been employed. Id. at 190, 196. The Court paid particular attention to how the program was funded and noted that the allocation of funds from a lump-sum appropriation is traditionally committed to agency discretion to meet its statutory responsibilities. Id. at 192. The Court concluded that allocations from lump-sum appropriations, once made, are committed to agency discretion and unreviewable as matters of agency discretion. Id. at 194. The Court however did not opine on the general trust responsibility IHS owed to handicapped Indian children or to tribes. See id.

The Eighth Circuit also has considered whether the United States has a trust duty to provide health care to Indians. In White v. Califano, 581 F.2d 697, 697 (8th Cir. 1978) (per curiam), the Eighth Circuit confronted the Government's responsibility to provide and pay for the involuntary commitment of an indigent, mentally ill woman of the Oglala Sioux Tribe.[9] The Eighth Circuit's opinion adopted the statement of facts and the reasoning of the district court, and specifically quoted District Judge Andrew Bogue's opinion that through the IHCIA:

> Congress has unambiguously declared that the federal government has a legal responsibility to provide health care to Indians. This stems from the "unique relationship" between Indians and the federal government, a relationship that is reflected in hundreds of

---

[9] The Oglala Sioux Tribe was party to the 1868 Treaty of Fort Laramie, but the Treaty is not mentioned in either the Eighth Circuit or district court decisions in White.

cases and is further made obvious by the fact that one bulging
volume of the U.S. Code pertains only to Indians.

Id. at 698 (quoting White v. Califano, 437 F. Supp. 543, 555 (D.S.D. 1977)). Judge Bogue had

reasoned that the IHCIA was "a manifestation of what Congress thinks the trust responsibility

requires of federal officials, with whatever funds are available, when they try to meet Indian health

needs." Id. Although White predates the Supreme Court's decisions in Mitchell I, Mitchell II,

Navajo Nation I, Navajo Nation II, and Lincoln, those cases do not overrule or contradict the

Eighth Circuit or District Court holding or reasoning in White.

The Ninth Circuit and a district court therein, however, have considered claims brought by

tribes alleging a governmental duty to provide health care and found that no such trust duty existed.

See Quechen Tribe of the Ft. Yuma Indian Reservation v. United States, 599 Fed. App'x 698, 699

(9th Cir. 2015); Gila River Indian Cmty. v. Burwell, 2015 WL 997857 (D. Ariz. March 6, 2015).

In Quechen Tribe, the Ninth Circuit relied on language in Lincoln stating that the Snyder Act and

the IHCIA address Indian health in only general terms and concluded that those statutes do not

contain sufficient trust-creating language to impose a judicially enforceable duty. Quechen Tribe,

599 Fed. App'x at 699. The Gila River case involved a contract under the Indian Self-

Determination and Education Assistance Act through which the tribe provided health care to its

members. Gila River, 2015 WL 997857 at 1. The federal district court in Gila River found that

tribes' breach of trust claims as recognized in the Ninth Circuit involve a corpus of Indian property

or funds to be managed by the federal government, not applicable to health care appropriations.

Id. at 5.

Although a substantive source of law is required to establish and define an actionable

fiduciary duty owed by the Government, the Supreme Court has also recognized the moral

responsibility the United States owes to Indian tribes. "The Government, following a humane and

19

self[-]imposed policy…, has charged itself with moral obligations of the highest responsibility and trust… obligations to the fulfillment of which the national honor has been committed." Jicarilla Apache Nation, 564 U.S. at 176 (cleaned up and internal quotations omitted).

## B. Government's Argument for Summary Judgment

The Government argues that the Tribe has failed to identify any substantive source of law creating a duty or a trust corpus that could give rise to a common law trust duty. Doc. 81 at 11–18. The Government asserts that the provisions of the Snyder Act and the IHCIA cited by the Tribe are general statements of aspirational policy that do not create specific responsibilities to provide health care to the Tribe. Doc. 81 at 13–16. The Government further argues that the 1868 Treaty of Fort Laramie does not impose a trust duty and that the Government has not breached any duty that could exist under the Treaty. Doc. 81 at 16–18. In short, the Government argues that no fiduciary duty exists regarding Indian health care for the Tribe and its members, and thus summary judgment should enter. Doc. 81 at 11.

This Court does not accept the Government's conclusion that it owes no duty for health care to the Tribe or its members. Although some courts have found that the Snyder Act and the IHCIA speak of Indian health care in terms too general to create an enforceable duty, see Quechen Tribe, 599 Fed. App'x at 699, the Eighth Circuit has explicitly recognized that these acts create a "legal responsibility to provide health care to Indians," White, 581 F.2d at 698 (quoting White, 437 F. Supp. at 555). Furthermore, despite these "general terms," the Supreme Court made note of IHS's "statutory mandate to provide health care to Indian people." Lincoln, 508 U.S. at 194.

The Government also asks this Court to interpret the 1868 Treaty of Fort Laramie in such a way that would diminish the deal negotiated between the Sioux Nation and the United States. Doc. 81 at 16–18. The terms of the Treaty provide that the United States will "furnish annually to

the Indians the physician," and "that such appropriations shall be made... as will be sufficient to employ such persons." 1868 Treaty of Fort Laramie art. XIII. The Government urges this Court to interpret that clause literally and find that the United States exceeds its duty under the Treaty by employing more than one physician at the Rosebud IHS Hospital. Doc. 81 at 17. The Indian law cannons of construction require "that treaties should be construed liberally in favor of the Indians," Oneida Cty. N.Y., 470 U.S. at 247, and courts "interpret Indian treaties to give effect to the terms as the Indians themselves would have understood them," Minnesota v. Mille Lacs Band of Chippewa Indians, 526 U.S. 172, 196 (1999).[10]  Under a fair but liberal construction of the language used to favor the Tribe, the Sioux Nation and the United States as well at the time must have meant the clause—that the United States furnish "the physician" and "that such appropriations shall be made from time to time... as will be sufficient to employ such persons"— to require the United States to provide physician-led health care to tribal members.[11]  Such physician-led health care may fairly imply some level of professional competency.  See Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. at 681 (explaining how the Supreme Court has ordered "adjustment and accommodation" of treaty language to protect Indian fishing rights in United States v. Winans, 198 U.S. 371, 384 (1905)).

---

[10] This Court recognizes that there is a limit to the liberal interpretation of treaties to favor the Indians. "[E]ven though legal ambiguities are resolved to the benefit of the Indians, courts cannot ignore plain language that, viewed in historical context and given a fair appraisal, clearly runs counter to a tribe's later claims." Oregon Dep't of Fish and Wildlife v. Klamath Tribe, 473 U.S. 753 (1985) (cleaned up and citations omitted).  Still and yet, and in historical reality, treaties between the Government and tribes routinely were written by the Government in English rather than in the language spoken by tribal chiefs or members and frequently involved tribal representatives placed under extreme duress.

[11] If this Court were to adopt a truly literal interpretation as the Government suggests, the Government could satisfy its duty by employing and furnishing a physician and housing him on the reservation without the physician providing any sort of services. This interpretation could not have been the intended result of the negotiating parties.

Congress has not extinguished the 1868 Treaty of Fort Laramie but has legislated to widen the Government's role in providing health care to tribal members generally. Mille Lacs Band, 526 U.S. at 202 (treaty rights are not extinguished absent Congress expressing a clear intent to do so).

The Government's brief highlights the lump sum appropriations that IHS receives from Congress and attempts to use that funding structure to negate the existence of a duty to the Tribe. Doc. 81 at 18–21. To do this, the Government relies largely on Lincoln v. Vigil. In Lincoln, the Supreme Court correctly characterized the plaintiff's claim as a challenge to the allocations IHS made to programs from the lump sum appropriations it received from Congress. Lincoln, 508 U.S. at 192. The Court accordingly focused its attention on its authority to review IHS's discretionary spending under the APA. Id. at 190–91. The Court in Lincoln did not address whether the United States had a duty to provide health care to tribal members or the scope of that duty. Rather, the Court acknowledged both that the Snyder Act and the IHCIA "speak about Indian health only in general terms," and that the IHS is under a "statutory mandate to provide health care to Indian people." Id. at 194. The Government is correct that the distribution of the funds from lump-sum appropriations is entrusted to IHS and that this Court may not review those allocations under the Supreme Court's holding in Lincoln. Doc. 81 at 20. However, that does not address the issue now before this Court on the cross motions for summary judgment as to whether any duty exists to the Tribe for health care and the extent of that duty. Lincoln stands for the proposition that lump-sum appropriations, once given, allow IHS considerable discretion in how it executes its duties; Lincoln does not hold that the existence of lump-sum appropriations for IHS absolves IHS of any duty to provide health care to the Tribe and its members.

The Government's reliance on the lump-sum appropriations to absolve it of any duty is also undercut by the Supreme Court's ruling in Quick Bear, 210 U.S. 50 (1908). Because the 1868

Treaty of Fort Laramie specifically addressed health care for the Tribe including "that such appropriations shall be made from time to time... as will be sufficient to employ such persons," the money allocated to Rosebud IHS Hospital represents, at least in some measure, the performance of a treaty obligation, and therefore a trust duty attaches. Id. at 66. Although the Supreme Court in Quick Bear was able to parse out whether money appropriated was the payment of a treaty obligation or a gratuitous appropriation of public funds based on the headings of the appropriations bills, the Government's reply brief indicates that the appropriations for IHS in 2016, and consequently Rosebud IHS Hospital, were made "for the purpose of carrying out the Snyder Act, the ISDEA, the IHCIA, and the [Public Health Service Act]." Doc. 93 at 8. Because the Government has not identified a specific appropriation which annually funds the physician and a residence as promised in the 1868 Treaty of Fort Laramie, at least a portion of the funds allocated to Rosebud IHS Hospital through the more general appropriation bill must be in fulfillment of the Government's treaty obligation, even if the bulk of those same funds are merely gratuitous appropriations for tribes without treaty provisions relating to Indian health care. See Quick Bear, 210 U.S. at 66; see also Mille Lacs Band, 526 U.S. at 202 (explaining that a tribe's treaty rights are not extinguished unless Congress clearly expresses its intent to do so).

When looking at the facts in the light most favorable to the Tribe, this Court cannot reach the conclusion urged by the Government. The United States does owe the Tribe some duty to provide health care to its members, even if the fiduciary duty judicially enforceable is just competent physician-led health care based on the construction of the 1868 Treaty of Fort Laramie as explained above. Therefore, the Government's motion for summary judgment based on lack of any duty is denied.

## C. Tribe's Argument for Summary Judgment

The Tribe moves for summary judgment, seeking a declaration that "the Government is not fulfilling its treaty and statutory obligations to provide the quantity and quality of health care that will raise the health of tribal members to the highest level and eliminate health disparities suffered by the Tribe." Doc. 89 at 40–41. In support of its motion, the Tribe cites several reports and testimony about deficient conditions at Rosebud IHS Hospital. Docs. 91-1, 91-3–91-7, 91-10–91-11, 91-14, 91-16–91-19, 91-21–91-29. The Government largely does not dispute the material cited by the Tribe, but maintains that all of this is immaterial to the legal issue of the Government's duty or lack thereof. Doc. 94. The Tribe argues that the reports and testimony prove that the Government has breached its duty to provide the level of care that will raise the health status of the Tribe to the highest possible level.

This Court cannot accept the Tribe's conclusion because it overstates the Government's duty. The Tribe points to language in three sources of law which it claims establishes a duty, each of which addresses health care provisions for Indians in quite different terms. See 1868 Treaty of Fort Laramie art. XIII; 25 U.S.C. § 13; 25 U.S.C. § 1601 et seq. The Tribe then ignores two of these three sources and instead draws the language of the Government's duty from the most stringent standard of care found within one of the sources. Doc. 89.

The duty that the Tribe asks this Court to impose comes from the Congressional Findings section of the IHCIA. 25 U.S.C. § 1601. This particular statute reads "Congress finds [that] ... (3) A major national goal of the United States is to provide the quantity and quality of health services which will permit the health status of Indians to be raised to the highest possible level[.]" Id. The Declaration of National Policy in the IHCIA also states "Congress declares that it is the policy of this Nation, in fulfillment of its special trust responsibilities and legal obligations to

24

Indians - - (1) to ensure the highest possible health status for Indians and urban Indians and to provide all resources necessary to effect that policy." 25 U.S.C. § 1602(1). Although this statute specifically references the trust responsibility the United States holds relative to Indians, "[t]he fact that a statute uses the word 'trust' does not mean that an actionable duty exists." Ashley v. U.S. Dep't of Interior, 408 F.3d 997 (2005) (8th Cir. 2005). Furthermore, these statutes expressly state that "[a] major national goal of the United States is to provide... health services which will permit the health status of Indians to be raised to the highest possible level," and that "Congress declares that it is the policy of this Nation... to ensure the highest possible health status for Indians." 25 U.S.C. § 1601–02 (emphasis added). These statements alone are "too thin a reed to support the rights and obligations read into [them]" by the Tribe. Pennhurst State Sch. and Hosp. v. Halderman, 451 U.S. 1, 19 (1981). "Congress sometimes legislates by innuendo, making declarations of policy and indicating a preference while requiring measures that, though falling short of legislating its goals, serve as a nudge in the preferred directions." Id. (quoting Rosado v. Wyman, 397 U.S. 397, 413 (1970)). These statutes on their own do not impose an affirmative duty on any federal agency, but rather express Congress's goals. As an expression of a national goal— to provide "the quantity and quality of health services which will permit the health status of Indians to be raised to the highest possible level"— is not the enforceable legal duty owed by the Government to the Tribe.

This Court recognizes that other provisions in the IHCIA place affirmative duties on the Government for Indian health care. 25 U.S.C. § 1601 et seq. However, those duties are more limited in scope than the broad, aspirational duty proposed by the Tribe. The Tribe's motion for summary judgment is based solely on an asserted breach of the more stringent duty contained in § 1602 and must be denied to that extent.

This Court in its prior Opinion and Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, Doc. 36, determined that the Tribe's allegations in Count III of its complaint about breach of a duty under the 1868 Treaty of Fort Laramie, IHCIA, and trust responsibility were sufficient to survive a motion to dismiss. This Court's decision not to define that duty led to the starkly different views of the parties in the cross motions for summary judgment both as to what facts are material and to what duty, if any, the Government has to the Tribe and its members to provide health care. For the reasons explained above, the Government is wrong that it has no duty whatsoever to the Tribe, but the Tribe is wrong to insist that the duty is coterminous with the goal expressed in the IHCIA "to provide... health services which will permit the health status of Indians to be raised to the highest possible level."

Now, on cross motions for summary judgment, the parties have framed the question of what duty the Government owes the Tribe and its members for health care. As to the tribes that entered into the 1868 Treaty of Fort Laramie for the reasons discussed above, the Government's duty—expressed at the time as furnishing "to the Indians the physician... and that such appropriations shall be made from time to time, on the estimate of the Secretary of the Interior, as will be sufficient to employ such persons"—can be interpreted under the canons of construction applicable to Indian treaties as requiring the Government to provide competent physician-led health care to the Tribe.

### D. Standing

The Government's motion for summary judgment also argues that the Tribe lacks standing. Doc. 81 at 27–28. Article III of the Constitution limits a federal court's jurisdiction to "cases" and "controversies." U.S. Const. art III. The Supreme Court has recognized that one essential and unchanging part of the case-or-controversy requirement is a party's standing. Lujan v. Defenders

of Wildlife, 504 U.S. 555, 560 (1992). To have standing, a plaintiff must satisfy three elements. Id. The plaintiff must show that (1) it suffered an injury in fact, (2) the injury is fairly traceable to the defendant's action or inaction, and (3) a favorable decision will likely redress the alleged injury. Id. at 560–61. "Since [these elements] are not merely pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported... with the manner and degree of evidence required at the successive stages of the litigation." Id. at 561.

The Government does not challenge elements one or two of the standing doctrine but argues only that the Tribe cannot meet the redressability element. The Eighth Circuit addressed the redressability standard when it decided Ashley v. U.S. Department of Interior, 408 F.3d 997 (8th Cir. 2005). In Ashley, a group of tribal members brought suit against a federal agency seeking rescission of a bond agreement entered by the tribe and approved by the department as well as an order requiring the agency to oversee the tribe's spending of trust payments. Id. at 1000–01. The Eighth Circuit held that the members lacked standing because even if rescinded, the tribe could enter a similar agreement without the department's approval under an amendment to the statute at issue. Id. It also found that none of the legal sources cited by the tribe empowered the agency to control the tribe's expenditures. Id. at 1001. Essentially, the Eighth Circuit held that because the court could not issue an order that would likely redress the plaintiffs' claims, the tribal members lacked standing to pursue the action. Id. at 1003. (citing Lujan, 504 U.S. at 562).

The Tribe counters the Government's standing argument by asserting that a favorable declaratory judgment for the Tribe is likely to alter the Government's behavior in order to abide by the Court's interpretation of its legal duty. Doc. 89 at 37–40. The Declaratory Judgment Act allows this Court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The

Tribe asserts that it has standing to seek a declaratory judgment under the Supreme Court's decision in Franklin v. Massachusetts, 505 U.S. 788 (1992). The Court had the opportunity to reconsider the standing issue presented Franklin when it decided Utah v. Evans, 536 U.S. 452, 462–64 (2002), but it accepted Franklin's general premise. In Franklin v. Massachusetts and Utah v. Evans, the Supreme Court considered challenges to the counting methods used when conducting the national census. Evans, 536 U.S. at 460–61. In both cases, the Supreme Court found the plaintiffs to have standing because it was "substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision." Id. at 464 (quoting Franklin, 505 U.S. at 803).

The Supreme Court similarly considered a court's authority to issue a declaratory judgment of parties' relative rights and duties when it decided Aetna Life Ins. Co. v. Haworth, 300 U.S. 227 (1937). In Aetna Life, the Court was faced with whether a federal district court could constitutionally issue a declaratory judgment setting forth the rights and obligations of the parties under an insurance policy. Id. at 236–37. The Court recognized that in order to qualify as a "controversy," an issue must "touch[ ] the legal relations of the parties having adverse legal interests" and "be a real and substantial controversy admitting of specific relief through a decree of a conclusive character." Id. at 240–41. The Court found that when a court could provide "an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised [even though] the adjudication of the rights of the litigants may not require the award of process or the payment of damages." Id. at 241. The case essentially turned on whether an insured had been "totally and permanently disabled" under the policy's terms before his policy allegedly lapsed. Id. at 242. The

28

Court recognized that whatever the district court determined the prevailing party could expect some vindication of its rights. Id. at 243.

In this case, where the Government has argued it has no duty to provide health care to the Tribe and its members and indeed at one point put the Emergency Department serving the Tribe and its members on "divert status" to non-IHS facilities some fifty miles away from Rosebud, a declaratory judgment that the Government has a duty stemming from the 1868 Treaty of Fort Laramie holds some promise of being substantially likely to redress an injury. Because the parties' primary controversy is the extent of the applicable legal duty, much like the issues in Aetna Life, Franklin, and Evans, a definitive determination of such legal rights may affect the parties' behavior toward one another. Unlike the Government defendant in Ashley, which did not have ultimate authority to provide the requested relief, the Government Defendants in this case do have the authority to affect change in health care provided to the Tribe and its members. As in Franklin and Evans, it is likely that the Government will abide by this Court's authoritative interpretation of the 1868 Treaty of Fort Laramie. Of course, IHS remains funded through lump-sum appropriations, and as the Supreme Court has noted, allocations from those funds "requires a complicated balancing of a number of factors," and an "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." Lincoln, 508 U.S. at 193 (quoting Heckler v. Chaney, 470 U.S. 821, 830–31 (1985)). But this Court's declaration of the duty owed under the 1868 Treaty of Fort Laramie would not direct how IHS is to expend those lump sum appropriations.

**E. Jurisdiction**

The Government's final argument in its brief in support of its motion for summary judgment asserts that this Court lacks jurisdiction. Doc. 81 at 28–29. The Government bases its

argument on the notion that claims brought against the United States for money damages must be brought in the Court of Claims. Doc. 81 at 29. However, the Tribe seeks only equitable relief in the form of a declaratory judgment and a possible injunction. The Government's concerns about how such relief may result in federal agencies reevaluating and reapportioning their Congressional appropriations are misplaced because neither the declaratory judgment nor any later action by this Court would tinker with the apportionment of IHS's lump-sum appropriation. The equitable relief requested by the Tribe is not a veiled attempt to force expenditures of funds or an effort to evade the jurisdiction of the Court of Claims. This Court's limited declaratory judgment setting forth the justiciable duty owed by the Government to the Tribe for health care is within a federal district court's jurisdiction to enter. The Government's motion for summary judgment, Doc. 80, based on lack of jurisdiction is denied.

## IV. Conclusion

For good cause, it is hereby

ORDERED that the Government's motion for summary judgment, Doc. 80, is denied. It is further

ORDERED that the Tribe's motion for summary judgment, Doc. 88, is denied in part, but granted to the limited extent that this Court issues a declaratory judgment that the Defendants' duty to the Tribe under the 1868 Treaty of Fort Laramie expressed in treaty language as furnishing "to the Indians the physician" requires Defendants to provide competent physician-led health care to the Tribe's members.

DATED this __30th__ day of March, 2020.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE

30